# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                        No. CR 16-1106 JB

JEFFREY ANTONIO,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Dismiss for Lack of Federal Subject Matter Jurisdiction, filed April 10, 2017 (Doc. 62)("Motion"). The Court held an evidentiary hearing on April 11, 2017, and a hearing on April 12, 2017. The primary issue is whether the Court has jurisdiction over this matter under the Indian Pueblo Land Act Amendments of 2005, Pub. L. No. 109-133, 119 Stat. 2573 (Dec. 20, 2005), codified at 25 U.S.C. § 331 Note, because the automobile collision giving rise to Plaintiff United States of America's criminal prosecution against Defendant Jeffrey Antonio, which occurred on private land, nonetheless occurred within the exterior boundaries of the 1748 Spanish land grant to the Sandia Pueblo, which Congress confirmed in the Act of December 22, 1858, 11 Stat. 374, 374 (1859). The Court concludes: (i) the automobile collision giving rise to this criminal cause of action occurred within the exterior boundaries of the 1748 Spanish land grant; and, consequently, (ii) under 25 U.S.C. § 331 Note, the Court has jurisdiction over this matter. Accordingly, the Court denies Antonio's Motion.

## FACTUAL BACKGROUND

In a criminal prosecution under 18 U.S.C. §§ 1152 or 1153, the Court determines its jurisdiction based on facts established by a preponderance of the evidence. See United States v.

Bustillos, 31 F.3d 931, 933 (10th Cir. 1994)(citing McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936)). The United States charges Antonio with a violation of 18 U.S.C. § 1153. See Indictment at 1, filed March 23, 2016 (Doc. 2)("Indictment"). The following facts, which the Court finds by a preponderance of the evidence, are relevant to the Court's jurisdictional determination:

1.      On May 16, 1748, Lieutenant General Don Bernardo Antonio de Bustamante y Tagle, acting under a duly authorized commission, conveyed a land grant to the Sandia Pueblo. See Menchero, Fray Juan Miguel, Joachin Codallos y Rabal & Bernardo Antonio de Bustamante y Tagle, "Proceedings in regard to the construction of the Mission and Pueblo of our Lady of Sorrow of Sandia, concerning which this attestation, to the letter, is sent to the Superior Government of this New Spain as will be Perceived within etc," Spanish Archives of New Mexico Series I, No. 848, at 1-6 (1748)(Myra Ellen Jenkins, Ph.D., trans. (1994)), http://digitalrepository.unm.edu/law_certificate_indianlaw_sandia/59 (last visited June 2, 2017)("1748 Pueblo of Sandia Grant.").

2.      In pertinent part, the 1748 Pueblo of Sandia Grant, which was memorialized by Bernardo Antonio de Bustamante y Tagle, provides:

> In this pueblo and said mission of Nuestra Señora de los Dolores and San Antonio de Sandia on the 16th day of the month of May of 1748 I the Lieutenant General Don Bernardo Antonio de Bustamante y Tagle, by special commission which I hold from the Senor Sergeant Major Don Joachín Codallos y Rabál, Governor and Captain General of this Kingdom of New Mexico to do so having made myself aware and informed concerning the petition of the Reverend Minister Father, Delegate Commissary and Procurator General of this Custody and giving compliance to all that which the said Minister Reverend Padre petitions, and complying with that which the above proceedings demand, being in this said mission for the royal and personal possession which I should give, ordered the settlers who are nearest, who are those who reside in this said pueblo on the southern and northern portions, who being present I notified of the commission which I hold to give the said possession to the Moquino sons who are gathered together to resettle

the said mission and to their minister and that if anything which should give them damage would take place that they explain the right which they may have, to which they responded that notwithstanding that the measurements included some granted and purchased land, they would cede them without any controversy since the order is superior to a recourse they could allege by law. And there being no further opposition which I verbally inquired as I had been ordered to do, I proceeded to give royal and personal possession, first proceeding to give the name and avocation to the said new mission in perpetuity, placing on it the name "Nuestra Señora de los Dolores y San Antonio de Sandia," and this nomination made, all the recently converted Indians of the said nation as resettlers gathered together and their father minister who is the Reverend Father Preacher Fray Juan Joseph Hernández, whom I led by the hand and in the name of his Majesty (may God guard him) I proceeded over the said land, I shouted and they shouted, threw rocks and pulled up grass and in a loud voice shouted many times "Long live the King, our Lord," and they received the royal possession without any opposition. The leagues conceded for a formal pueblo were measured and the cordels [measuring cords] extended to the west wind as far as the Rio del Norte, which is the boundary, having no more than 12 cordels of 120 Castillian varas each one which consisted of 1,440 varas, and in order to complete those which were lacking in this direction it was necessary to increase the leagues which pertain to the north and south winds equally so that the Spanish settler grantees would not be injured some more than others. The land which is encompassed in these three winds [directions] is all for raising wheat with the conveniences of water for the purpose of the land. And in order to perpetuate the memories and the designations I ordered them to place monument markers, mounds of mud and stone of the height of a man, with wooden crosses on top, these being on the north facing the point of the cañada which is commonly called "del Agua," and on the south facing the mouth of the Cañada de Juan Tabovo, and on the east the sierra madre called Sandia, within which limits are the conveniences of pastures, woods, waters and watering places in abundance in order to maintain their stock, both large and small and a horse herd, all of which Moquino Indian neophytes who are congregated as stated, so that they may enjoy them for themselves, their children, heirs and successors. Those who were present were found to be 350 persons, young and old, who comprise 70 families to whom jointly I conceded, pronounced and gave the royal possession in the name of his Majesty which is to be for them sufficient title so that neither now nor at any time can any occasion arise in which another person or persons will interfere with or enter into the designated boundaries. And being placed in possession and so that for all time it is certain I executed this proceeding, the official witnesses being the squadron corporal Antonio de Armenta and the soldier Juan Samon and I signed it with those of my assistance with whom I acted as jues receptor for lack of a royal and public scribe for there is none in this kingdom. Dated as above I certify. Bernardo Antonio de Bustamante y Tagle, Jues Receptor (rubric). Witness Ysidro Sánchez Tagle (rubric). Witness: Pedro Tafolla

(rubric). An attestation is made which is remitted to the superior government of this New Spain.

1748 Pueblo of Sandia Grant at 4-6 (emphasis added).

3.      The Rio Grande is the western boundary of the Sandia Pueblo's 1748 land grant. See 1748 Pueblo of Sandia Grant at 4-6.

4.      The collision central to this criminal case took place at the intersection of New Mexico Highway 313 and Wilda Drive in Bernalillo County, New Mexico. See Motion at 1 (asserting this fact); United States' Response to Defendants Motion to Dismiss for Lack of Subject Matter Jurisdiction ¶ 2, at 1, filed April 14, 2017 (Doc. 68)("Response")(asserting this fact).

5.      The location of the collision, which is the intersection of New Mexico Highway 313 and Wilda Drive in Bernalillo County, New Mexico, lies east of the Rio Grande. See Fed. R. Evid. 201(b)(1)("The court may judicially notice a fact that is not subject to reasonable dispute because it is generally known within the trial court's territorial jurisdiction.").

6.      The Sandia Pueblo does not own the land on which the collision occurred, because that land, known as Private Claim 364, came into Pedro C. Garcia's private ownership, "under the provisions of the Act of Congress on June 7, 1924 (43 Stat. 636)," confirmed by patents from the United States to Pedro C. Garcia. See Pedro C. Garcia Patent 1069186 (executed December 20, 1933), filed April 10, 2017 (Doc. 62-2)("1933 Garcia Patent"); Pedro C. Garcia Patent 1067360 (executed April 26, 1934), filed April 10, 2017 (Doc. 62-2)("1934 Garcia Patent"). See also Draft Transcript of Motion Proceedings at 46:9, taken April 11, 2017 (Ortiz)("April 11 Tr.")(referring to the Garcia parcel as Private Claim 364").[1]

---

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

7.     In 1930, Pedro C. Garcia and Beneranda S. Garcia conveyed in fee-simple a parcel of land to the Middle Rio Grande Conservancy District ("MRGCD").[2] See Receipt and Conveyance, introduced as Defendant's Hearing Ex. C., April 11, 2017 ("1930 Garcia Conveyance"); April 11 Tr. at 24:4-6 (Stretch).

8.     The 1930 Garcia Conveyance purports to convey:

> All of that part of tract No. 79 on the Middle Rio Grande Conservancy District Property Map No. 20 required for right-of-way for the Albuquerque Riverside Drain and Levee and for Floodway, being all of said tract lying west of a line drawn from a point on the south boundary 948 feet, more or less, easterly from the east bank of the Rio Grande to a point on the north boundary 808 feet, more or less, easterly from the east bank of the Rio Grande and containing 28.78 acres, more or less.

1930 Garcia Conveyance at 1.

9.     The 1930 Garcia Conveyance describes the Rio Grande as the west boundary of the tract that Garcia conveyed to the MRGCD. See 1930 Garcia Conveyance at 1. See also April 11 Tr. at 29:1-2 (Stretch)("The west boundary of the tract is described as the bank of the Rio Grande.").

10.    Since 1914, the Rio Grande has moved west, leaving a strip of land between the Rio Grande's current east bank and the original Garcia parcel, which includes that tract that Garcia conveyed to the MRGCD. See Original Field Notes of the Dependent Resurvey of a Portion of the South Boundary of the Sandia Pueblo Grant, a Portion of the North Boundary, a Portion of the Subdivisional Lines, and Certain Private Claim Boundaries within the Sandia Pueblo grant in Section 2, and a Metes-and-Bounds Survey in Section 2, Township 11 North,

---

[2]The MRGCD was created in 1925 to manage the irrigation systems and control floods in the Albuquerque Basin and is headquartered in Albuquerque, New Mexico. The MRCGD offers irrigation, flood control and responsible water conservation services to irrigators and farmers in the middle agricultural region of New Mexico. See "About the MRGCD," http://www.mrgcd.com/About.aspx (last visited June 2, 2017).

Range 3 East, of the New Mexico Principal Meridian, in the State of New Mexico at 12, 16, 43-44, United States Department of the Interior, Bureau of Land Management, New Mexico State Office (executed by Lonnie Bitsoi)(survey completed April 20, 2004), https://glorecords.blm.gov/details/survey/default.aspx?dm_id=84672&sid=pcalp2eb.02b ("2004 BLM Survey")(noting that in 1914, the western boundary of the Pedro Garcia Claim, Private Claim 364, was the left bank of the Rio Grande). See also April 11 Tr. at 49:19-25 (Murphy, Ortiz)("Q. Let me ask you is there a portion of Sandia Pueblo land lying between the western boundary of the Pedro Garcia tract and the western boundary of the Sandia Pueblo? A. Yes, it is. All of this portion in here belongs to the Pueblo of Sandia.").

11. The Sandia Pueblo owns the land located between the current easterly bank of the Rio Grande and the original Garcia parcel, which includes that land which Garcia conveyed to the MRGCD. See April 11 Tr. at 49:19-25 (Murphy, Ortiz); April 11 Tr. at 52:9-10 (Ortiz)(averring that, west of the Pedro Garcia parcel, "the rest of the Pueblo of Sandia land").

12. The Sandia Pueblo fenced and posted the land west of the Albuquerque Riverside drain and east of the Rio Grande. See April 11 Tr. at 53:2-8 (Murphy, Ortiz).

13. The Garcia parcel, including the land that Garcia conveyed to the MRGCD, lies within the exterior boundaries of the 1748 grant to the Sandia Pueblo. See April 11 Tr. at 49:19-25.

14. The collision site lies within the exterior boundaries of the 1748 grant to the Sandia Pueblo. See 1748 Pueblo of Sandia Grant at 4-6. See also Pueblo of Sandia Boundary, 96 Interior Dec. 331, 350, 1988 WL 410394, at *16 (Dec. 9, 1988).

**PROCEDURAL BACKGROUND**

On March 23, 2016, a federal grand jury indicted Antonio, asserting violations of 18

U.S.C. §§ 1153 and 1111. See Indictment at 1. In the Indictment, the grand jury charged that, "[o]n or about July 31, 2015, in Indian Country, in Bernalillo County, in the District of New Mexico, the defendant, Jeffery Antonio, an Indian, unlawfully killed Jane Doe with malice aforethought." Indictment at 1. The United States alleges that Antonio, while under the influence of alcohol, drove his vehicle across a lane of traffic into the victim's vehicle, causing her death. See Response ¶ 1, at 1.

**1.      Antonio's Motion.**

Antonio moves the Court to dismiss the Indictment for lack of subject-matter jurisdiction. See Motion at 1. In his Motion, Antonio argues that the Court lacks subject-matter jurisdiction, because the alleged crime did not occur within Indian Country. See Motion at 3-6. Antonio's principal argument is that the precise location in which the alleged crime occurred "is not within the Exterior Boundary of the Sandia Pueblo but rather is a non-Indian Country Peninsula" that protrudes into the Sandia Pueblo from the west. Motion at 3. Antonio first states that the collision did not occur on Sandia Pueblo land, but on privately held land. See Motion at 5. According to Antonio, the parcel on which the collision occurred first came into private ownership by way of a June 7, 1924, grant from the United States to Pedro C. Garcia. See Motion at 5. See also 1933 Garcia Patent; 1934 Garcia Patent. Next, Antonio avers that the Garcia patent land extended westward to the Rio Grande. See Motion at 6. Consequently, Antonio reasons that the privately held land on which the collision occurred is within a "peninsula" of privately held land, ostensibly originating with the Garcia patent, that juts into the Sandia Pueblo from the west. See Motion at 6. Antonio states that "[t]his privately held land is not surrounded or enclosed by Sandia Pueblo," such that "[o]ne can enter and exit [the Garcia patent] land, through the Rio Grande, by never entering Sandia Pueblo." Motion at 6.

Antonio also advances a notice-based argument in the Motion; he objects "to the indictment for lack of specificity."  Motion at 4.  Antonio adverts to 18 U.S.C. § 1151, which defines the term "Indian country" in three principal ways, and asserts that "[i]t is unclear from the indictment which of the three theories the Government intends to use to establish jurisdiction."  Motion at 4.  Antonio reasons that "[t]he lack of specificity . . . creates an issue of lack of notice to the defendant."  Motion at 4.

2.     **Antonio's Supplement.**

On April 12, 2017, Antonio filed a Supplement to the Motion, in which he addresses the "appropriate standard of proof regarding the issue of jurisdiction."  Supplement to Motion to Dismiss for Lack of Federal Subject Matter Jurisdiction at 1, filed April 12, 2017 (Doc. 66)("Supplement").   Antonio emphasizes that the Court's jurisdiction depends upon the resolution of a factual issue.  See Supplement at 1 ("[W]hether the site of the accident giving rise to this prosecution is within 'Indian Country' . . . [is an] issue of fact."); Supplement at 3 ("There is a real question, a factual question, as to whether the private land on which the accident occurred is entirely surrounded by Pueblo land."); Supplement at 4 ("[W]hether the location of the accident is within the exterior boundaries of Sandia Pueblo is a question of fact that depends on the determination of the ownership of lands to the west of the accident site.").  Antonio argues that this distinct factual question renders inapplicable the United States Court of Appeals for the Tenth Circuit's decision in United States v. Roberts, 185 F.3d 1125 (10th 1999), in which "the Tenth Circuit held that '[a]s a general matter, the trial court decides the jurisdictional status of a particular property or area and then leaves to the jury the factual determination of whether the alleged crime occurred at the site.'"  Supplement at 2 (quoting United States v. Roberts, 185 F.3d at 1139).

Antonio next reasons that, because the Court's jurisdiction "turns on a factual determination, the matter must be presented to the jury . . . ." Supplement at 2. Antonio concludes that, because the jurisdictional issue is a factual question that the Court should present to the jury, the United States has the burden to prove to a jury beyond a reasonable doubt that the land on which the collision occurred is surrounded by the Sandia Pueblo's exterior boundaries. See Supplement at 1 ("[T]he government must prove jurisdiction beyond a reasonable doubt."); Supplement at 4 ("Issues of fact should be addressed to the jury, and proved beyond a reasonable doubt."). Accordingly, Antonio "requests that the matter be submitted to the jury." Supplement at 4.

**3.     The United States' Response.**

The United States argues that the Court should deny the Motion, because "[t]he location of the collision was within 'Indian Country.'" Response at 2 (quoting 18 U.S.C. § 1853). First, the United States addresses the standard of review and the burden of proof.    See Response at 2. The United States asserts that "[j]urisdictional issues are matters of law decided by the court, rather than the jury." Response at 2 (citing United States v. Tinoco, 304 F.3d 1088, 1107 (11th Cir. 2002)). The United States contends that "[a] trial court decides if a particular area is legally Indian Country, but 'leaves to the jury the factual determination of whether the alleged crime occurred at the site.'" Response at 2 (quoting United States v. Roberts, 185 F.3d at 1139). The United States concedes that "[t]he burden remains on the United States to establish the crime occurred at the location alleged." Response at 2. "Where jurisdiction is challenged," the United States explains, "the party seeking to invoke the jurisdiction of the Court must prove that it exists by a preponderance of the evidence." Response at 2 (citing United States v. Bustillos, 31 F.3d 931, 933 (10th Cir. 1994)).

After addressing the standard and burden of proof, the United States pivots to its substantive argument for the Court's jurisdiction.  See Response at 2-7.  The United States does not dispute that the location where the collision occurred is privately held land.  See Response at 2.  The United States disputes, however, Antonio's two contentions that "the privately held land encompassing the collision site extends westward to the Rio Grande River" and that "the privately held land thereby abuts other non-Indian land, forming a 'peninsula' of private property extending in the boundaries of the Sandia Pueblo . . . ."  Response at 2-3.

The United States concedes that the United States gave a patent to Pedro C. Garcia and his heirs, thereby relinquishing certain lands within the Sandia Pueblo.  See Response at 3.  The United States argues, however, that the patented, granted land to Garcia is located entirely within the Sandia Pueblo, being enclosed by the Sandia Pueblo's outer boundaries.  See Response at 6.  To this point, the United States emphasizes that "[t]he patents from 1933 and 1934 granting title to Pedro C. Garcia and his heirs against the United States and the Pueblo of Sandia explicitly describe the tracts of land as 'within' the Pueblo of Sandia."  Response at 6.  The United States refers to the Tenth Circuit's opinion in United States v. Baker, 894 F.2d 1144 (10th Cir. 1990), for the proposition that "'private property owned by non-Indians but situated within the boundaries of any Indian reservation' is Indian Country."  Response at 5 (quoting United States v. Baker, 894 F.2d at 1149).  Consequently, the United States concludes that the location at which the collision occurred, even though privately held, is Indian Country.  See Response at 6.

The United States also argues, in the alternative, "[e]ven if . . . it is possible to travel from the collision site to private property west of the Rio Grande . . . , without setting foot on land belong to the Pueblo of Sandia, the Court should still determine that the collision site is 'Indian Country' for the purpose of 18 U.S.C. § 1151."  Response at 6.  The United States adverts to the

Supreme Court of the United States' opinion in <u>Seymour v. Superintendent of Washington State Penitentiary</u>, 368 U.S. 351 (1962)("<u>Seymour</u>"), in which the Supreme Court rejected "'an impractical pattern of checkerboard jurisdiction'" in which "'law enforcement officers operating in the area will find it necessary to search tract books in order to determine whether criminal jurisdiction over each particular offense, even though committed within the reservation, is in the State or Federal Government.'"  Response at 6 (quoting <u>Seymour</u>, 368 U.S. at 358).  In light of the Supreme Court's concern, the United States argues that, for the Court

> [t]o hold that the segment of that land crossed by Highway 313, where the collision site is located, is not "Indian Country" would require officers patrolling that road or responding to calls along it to search tract books or historic patents in order to determine jurisdiction, contrary to the guidance provided by the Supreme Court.

Response at 7.  The United States contends, therefore, that the Court should deny the Motion and conclude that "the intersection of New Mexico Highway 313 and Wilda Drive in Bernalillo County, New Mexico, is 'Indian Country' for the purpose of federal law."  Response at 7.

### 4.    <u>The Hearing</u>.

The Court held an evidentiary hearing on the Motion on April 11, 2017.  <u>See</u> April 11 Tr. at 1:1-3.  The Court also heard argument regarding the Motion on April 12, 2017.  <u>See</u> Draft Transcript of Motion Proceedings at 53:9-58:14, taken April 12, 2017 ("April 12 Tr.").  At the April 11, 2017, hearing, the Court heard argument and testimony regarding Antonio's Motion. <u>See</u> April 11 Tr. at 18:23-25 (turning to Antonio's motion to dismiss for lack of jurisdiction).

In support of his Motion, Antonio first offered the testimony of Doug Stretch, a mapping supervisor for the MRGCD who maintains and updates all the MRGCD's real property and irrigation records.  <u>See</u> April 11 Tr. at 20:13-25 (Stretch).  Stretch testified that the MRGCD "was formed in the 1920s to assist with the issues and impacts of the river with flood control,

drainage and irrigation." April 11 Tr. at 21:7-10 (Stretch). According to Stretch, the MRGCD "acquired rights of way throughout all four counties in the middle valley; fee simple in some cases, easements in others." April 11 Tr. at 21:20-22 (Stretch). Stretch explained that "[i]n the cases of pueblo lands we have easements only. In cases of the rest of the valley, we would primarily have fee simple." April 11 Tr. at 23:9-11 (Stretch).

During Stretch's testimony, Antonio introduced Defendant's Hearing Ex. A, Middle Rio Grande Conservancy District 2014 Property Map Sandoval/Bernalillo Counties, Map 20, introduced April 11, 2017 ("2014 MRGCD Map 20"). Stretch identified this document as "a property map that was generated by GIS in my department in 2014." April 11 Tr. at 22:3-4 (Stretch). Antonio also introduced a 1930 conveyance of land from Pedro C. Garcia and Beneranda S. Garcia to the MRGCD. See Receipt and Conveyance, introduced as Defendant's Hearing Ex. C., April 11, 2017 ("1930 Garcia Conveyance"). Stretch testified that the 1930 Garcia Conveyance is "a receipt conveyance deed giving the district fee simple right-of-way for that portion of tract 79 that's on MRGCD map 20." April 11 Tr. at 24:4-6 (Stretch).

On cross-examination, Stretch communicated that the MRGCD acquired land in "fee simple . . . for the purposes of a right-of-way." April 11 Tr. at 26:7-8 (Stretch). Stretch also explained that the 1930 Garcia Conveyance "was to purchase that piece of the property for the Albuquerque Riverside drain and levy and flood way." April 11 Tr. at 28:3-5 (Stretch). The 1930 Garcia Conveyance purports to convey:

> All of that part of tract No. 79 on the Middle Rio Grande Conservancy District Property Map No. 20 required for right-of-way for the Albuquerque Riverside Drain and Levee and for Floodway, being all of said tract lying west of a line drawn from a point on the south boundary 948 feet, more or less, easterly from the east bank of the Rio Grande to a point on the north boundary 808 feet, more or less, easterly from the east bank of the Rio Grande and containing 28.78 acres, more or less.

1930 Garcia Conveyance at 1. Stretch testified that the conveyance describes the Rio Grande as the west boundary of the tract that Garcia conveyed to the MRGCD. See April 11 Tr. at 29:1-2 (Stretch)("The west boundary of the tract is described as the bank of the Rio Grande."). Stretch said that, while he had not been to this property, he had "driven past the corners . . . on the east side of the tract." April 11 Tr. at 30:16-17 (Stretch). Stretch also explained that the tracts 79 and 79A, on 2014 MRGCD Map 20, "have undergone a number of revision or platting actions that took portions of those [tr]acts." April 11 Tr. at 30:18-20 (Stretch). Stretch conceded on cross-examination that he "would . . . consider the corners established by the [Bureau of Land Management] to be accurate." April 11 Tr. at 31:1-8 (Murphy, Stretch).

On redirect examination, Stretch testified that in the area that 2014 MRGCD Map 20 represents, from tract 79 to the Rio Grande, the MRGCD "did not need to request permission from Sandia Pueblo to install the [Albuquerque] drain." April 11 Tr. at 32:24-33:2 (Rivas, Stretch). On re-cross examination, Stretch also clarified -- by pointing to the appropriate area on the 2014 MRGCD Map 20 -- the land which MRGCD had purchased from Garcia. See April 11 Tr. at 33:16-22 (Murphy, Stretch)("Q. [C]ould you please indicate again the portion between 79 and 79A and the river that we were just talking about?  A. From the Riverside drain we would have purchased this piece for tract 79 and this piece for tract 79A1.").

Next, Antonio offered testimony from Mack Guardiola, an investigator at the Federal Public Defender's Office. See April 11 Tr. at 38:17-39:2 (Guardiola). Antonio adverted to a 2017 Bernalillo County Map T11N-R3E-SEC 2, filed April 10, 2017 (Doc. 62-5)("2017 Bernalillo County Map"), which the Bernalillo County Public Works Department provided to Guardiola, see April 11 Tr. at 39:8-10 (Rivas, Guardiola). Guardiola testified that, with respect to the 2017 Bernalillo County Map, "everything in white on this map was private claimed

property either by deed or easement.  But that everything in yellow belonged to and was

managed by Sandia Pueblo."  April 11 Tr. at 39:13-16 (Guardiola).  Guardiola also testified that,

as the 2017 Bernalillo County Map portrays, Bernalillo County manages the area in white.  See

April 11 Tr. at 39:17-19 (Rivas, Guardiola).  The Court admitted the 2017 Bernalillo County

Map into evidence.  See April 11 Tr. at 43:5 (Court).

      The United States then offered the testimony of Earl Ortiz, a land surveyor with the

Bureau of Indian Affairs, Southern Pueblos Agency.  See April 11 Tr. at 44:20-22 (Ortiz).  Ortiz

testified that he personally reviewed the boundaries of the land conveyed to Garcia, see Tr. at

46:2-4 (Murphy, Ortiz), which he referred to as "PC [private claim] 364," April 11 Tr. at 46:9

(Ortiz).  Ortiz stated that the Bureau of Indian Affairs, Southern Pueblos Agency, "requested the

Bureau of Land Management to resurvey the private claim PC 364 in 2010 . . . ."  April 11 Tr. at

46:14-16 (Ortiz).  Ortiz then averred that the Bureau of Land Management conducted that 2010

survey.  See April 11 Tr. at 46:25 (Ortiz).[3]

      Ortiz testified that he personally inspected the corners of the BLM 2010 resurvey.  See

April 11 Tr. at 46:20-22 (Murphy, Ortiz).  The United States tendered as exhibits two renditions

of the Sandia Pueblo Base Map, filed April 14, 2017 (Doc. 68-1)("Sandia Pueblo Base Map"),

which the Court admitted as "Government's Exhibits 43 and 44."  April 11 Tr. at 49:2-3 (Court).

On the Sandia Pueblo Base Map, Ortiz identified "the Pedro Garcia Parcel."  April 11 Tr. at

48:1-2 (Ortiz).  Using the Sandia Pueblo Base Map as an exemplar, Ortiz then testified that what

he identified as "the Pedro Garcia Parcel," April 11 Tr. at 48:1-2 (Ortiz), was enclosed by the

exterior boundary of the Sandia Pueblo, see id. at 49:19-25 (Murphy, Ortiz)("Q.  Let me ask you

---

        [3]The Court notes that the parties did not introduce the 2010 Bureau of Land Management
survey of the Pedro Garcia parcel into the record; nevertheless, the United States relies on that
survey to support Ortiz' testimony that the Sandia Pueblo owns land between the Pedro Garcia
claim and the Rio Grande.  See, e.g., Tr. at 75:20-24 (Murphy); id. at 76:3-4 (Murphy).

is there a portion of Sandia Pueblo land lying between the western boundary of the Pedro Garcia tract and the western boundary of the Sandia Pueblo? A. Yes, it is. All of this portion in here belongs to the Pueblo of Sandia.").

Regarding the 1930 Garcia Conveyance, Ortiz opined that "[i]t seems to convey a portion of the Pedro Garcia parcel that we're talking about, PC 364. Without a map, I'm just guessing that it must be the westerly portion from the Albuquerque Riverside drain of the Pedro Garcia grant . . . ." April 11 Tr. at 50:22-51:1 (Ortiz). Ortiz also testified as to the extent of the land that Garcia conveyed to the MRGCD, stating that "[t]he Pedro Garcia parcel extends over to the west side of the Riverside drain maybe another 300 feet." April 11 Tr. at 51:23-25 (Ortiz). West of that parcel, Ortiz averred, is "the rest of the Pueblo of Sandia land." April 11 Tr. at 52:9-10 (Ortiz). Ortiz further stated that the Pueblo of Sandia fenced and posted the land west of the Albuquerque Riverside drain and east of the Rio Grande. See April 11 Tr. at 53:2-8 (Murphy, Ortiz). Ortiz also stated that private holdings "within pueblos up and down the Rio Grande [are] fairly common." April 11 Tr. at 53:21-24 (Murphy, Ortiz). On cross-examination, Ortiz conceded that, "[i]f the river moved," the boundaries of the Pueblo of Sandia might have changed. Tr. at 58:8 (Ortiz). April 11 Tr. at 58:3-8 (Rivas, Ortiz). On redirect, the United States focused Ortiz's attention on the Sandia Pueblo's eastern boundary in the Sandia mountains. See April 11 Tr. at 59:5-11 (Murphy, Ortiz). Upon the United States' inquiry, Ortiz opined that the distance from the Sandia Pueblo's eastern boundary to the Pedro Garcia tract is "about five miles." April 11 Tr. at 59:19 (Ortiz). The United States did not call another witness. See April 11 Tr. at 60:7-8 (Murphy).

The Court then allowed the parties to argue the Motion. See April 11 Tr. at 60:12-13 (Court). Antonio made clear his argument that the location of the collision is situated within a

peninsula of private land that juts into the Sandia Pueblo from the Rio Grande, because the Sandia Pueblo does not own property between the Albuquerque Riverside Drain and the Rio Grande. See April 11 Tr. at 64:15-18 (Rivas); April 11 Tr. at 65:3-16 (Rivas). Antonio pointed to Stretch's testimony that the MRGCD owns "private rights of way" between the Albuquerque Riverside Drain and the Rio Grande. April 11 Tr. at 65:8 (Rivas). Antonio contended that MRGCD privately held "land does go all the way to the river and across." April 11 Tr. at 76:11-12 (Rivas). Antonio relied on Stretch's testimony to argue that the MRGCD privately owns rights to the land between the Albuquerque Riverside Drain and the Rio Grande, because the MRGCD received those rights from private citizens. See April 11 Tr. at 76:17-19 (Rivas); April 11 Tr. at 76:23-77:1 (Rivas). The Court then asked Antonio what evidence shows that Pedro Garcia's privately held land extended to the Rio Grande. See April 11 Tr. at 77:15-16 (Court). Antonio responded: "Your Honor we do have an old map which we didn't submit for evidence, but this western boundary [of the] Sandia Pueblo has moved and we do believe that this entire peninsula up to the river was originally recognized as a piece of land not owned by the pueblo." April 11 Tr. at 77:17-22 (Rivas). Antonio also argued that the 1930 Garcia Conveyance and the 1933 and 1934 Garcia Patents confirm that Garcia's land, which he conveyed to the MRGCD, extended to the river and did not belong to the Sandia Pueblo. See April 11 Tr. at 78:3-5 (Rivas).

The United States, for its part, conceded that the 1933 and 1934 Garcia Patents "settle the title of these specified portions as being private land, as against the Pueblo of Sandia." April 11 Tr. at 68:17-19 (Murphy). The United States disputed, however, that the location of the collision is situated within a peninsula of private land that juts into the Sandia Pueblo from the Rio Grande. See April 11 Tr. at 69:7 (Murphy)("That's in dispute, your Honor."). The United States adverted to the 1933 and 1934 Garcia Patents, which state that "Pedro C. Garcia is entitled to a

patent . . . within the Pueblo of Sandia," 1933 Garcia Patent; 1934 Garcia Patent, and emphasized that the 1933 and 1934 Garcia Patents use the word "within" as "having the plain meaning of surrounded by." April 11 Tr. at 69:15-17 (Murphy). See April 11 Tr. at 69:22-23 (Murphy)("[T]he document says within. I'm construing that as surrounded."). The United States summarized its position:

> [T]he United States would submit that the land in question is shown in . . . United States 44 [i.e., the Pedro Garcia plot] is in fact entirely within the Pueblo of Sandia. That is to say that the western boundary of the Pedro Garcia plot lies inside the western boundary of the pueblo.

April 11 Tr. at 70:6-11 (Murphy).

The United States also conceded that Sandia Pueblo does not own the land on which the collision occurred, see April 11 Tr. at 72:3-6 (Court, Murphy), but argued that "[i]t is Indian Country by virtue of its location . . . within [the exterior boundaries of] the pueblo land." April 11 Tr. at 72:13-23 (Murphy). The United States disputed Antonio's argument that the land from the collision site to the Rio Grande is privately held, because the Sandia Pueblo Base Map, which the United States represented "is a copy of a map that the BIA developed," represents the Sandia Pueblo's outer boundaries as containing the Pedro Garcia parcel. April 11 Tr. at 75:18-19 (Murphy). The United States further relied on Ortiz' testimony that "he personally had gone to the corners established in the BLM's 2010 survey of the Pedro Garcia [parcel] and that [the Sandia Pueblo Base Map] is an accurate representation of its location." April 11 Tr. at 75:20-24 (Murphy). The United States also emphasized that, even if the MRGCD has rights of way, it received those rights of way from the Sandia Pueblo. See April 11 Tr. at 79:3-7 (Murphy)("The [M]iddle Rio Grande Conservancy District [received its] rights of way from the pueblo. That doesn't mean that that land is not Indian Country, the existence of a right-of-way is just that.").

The Court then inquired whether the United States believed that, in 1930, Garcia

conveyed to the MRGCD rights that Garcia did not have.  See April 11 Tr. at 79:8-10 (Court)("So what are you saying that Mr. Garcia is doing here, getting some money for something he doesn't have.").  The United States' responded: "I believe that Mr. Garcia [received] money for something he had Your Honor."  April 11 Tr. at 79:11-12 (Murphy).  The United States explained that Garcia conveyed his property to the MRGCD for the creation of the Albuquerque drain.  See April 11 Tr. at 79:14-25.  The United States contends, however, that Garcia's property did not extend to the Rio Grande.  See April 11 Tr. at 86:15-25 (Murphy).

The United States summarized its main argument:

> [E]ssentially it has been stated and not to waste the Court's time I think the Court's aware that what the United States is saying is that first this is a private holding.  It's shown by the document granting the patent that's signed by President Roosevelt that describes it as within Sandia Pueblo.  It's shown by the testimony the United States has presented from Mr. Ortiz, the surveyor, not just the surveyor but one who had been on the site and actually determined the boundaries of the property and his testimony that that is within the western boundary of Sandia Pueblo.

April 11 Tr. at 86:15-25 (Murphy).

The United States also argued, in the alternative, that "[i]t doesn't matter if [the privately held land within the Sandia Pueblo] is a peninsula or an island."  April 11 Tr. at 70:22-23 (Murphy).  The United States then adverted to Seymour, 368 U.S. at 357-58, and argued that, in Seymour, the Supreme Court reasoned that the definition of "Indian Country" provided by 18 U.S.C. § 1151 put to rest the jurisdictional issue concerning "lands lying within Indian reservations."  April 11 Tr. at 71:4-5 (Murphy).  See April 11 Tr. at 70:23-71:12 (Murphy).  The United States further argued that Seymour held that checkerboard jurisdiction is not only impractical but also "avoided by th[e] plain language [of 18 U.S.C. § 1151]."  April 11 Tr. at 71:14-15 (Murphy).

The Court confirmed its understanding that Antonio's argument hinges on the existence

of a peninsula of private land jutting into the Sandia Pueblo and encompassing the location of the crash site.  See April 11 Tr. at 86:5-8 (Court, Rivas)("Q.  I understand if there is not a peninsula would you agree with me that you've got a hard case to make.  A.  Yes, your honor.").  The Court then inquired as to the standard of proof.  See April 11 Tr. at 89:20 (Court).  The United States responded that it "must show as a matter of preponderance of the evidence that the location occurred within Indian Country within the meaning of § 1151."  April 11 Tr. at 90:2-3 (Murphy).

The Court gave Antonio the last word on the motion.  See April 11 Tr. at 90:17-18 (Court).  Antonio argued:

> [T]he Government has not met its burden proving that this land is within Sandia Pueblo, and therefore Indian Country.  We have provided evidence to the Court of the private nature of the lands to the river.  Even the documents from the Government establish that where this happened is private land.  Your Honor, there is no evidence presented by the Government that there is a strip of land between the exterior boundary of the land [and] Pedro Garcia's boundary.  Because they hold the burden . . . and the Rio Grande . . . has moved over the years, we do not know where the river was in 1934.  We ask the Court find that the Government has not met its burden . . . and that the Court should find that it's appropriate to dismiss the case against Mr. Antonio . . . .

April 11 Tr. at 90:21-91:13 (Rivas).

The Court expressed its inclination to deny the motion.  See April 11 Tr. at 92:4-5 (Court).  The Court stated: "[I]t seems to me that the Government has established by a preponderance of the evidence that there is a gap between the Pedro Garcia place and the [river] and that it is surrounded and within the exterior borders" of the Sandia Pueblo.  April 11 Tr. at 91:23-92:2 (Court).  The Court stated, however, that it would further study the cases and the evidence.  See April 11 Tr. at 91:20-21 (Court).

The following day, Antonio argued that the United States has the burden to show "beyond a reasonable doubt," April 12 Tr. at 56:3 (Robert), that the Pedro Garcia parcel is

"entirely circumscribed by the outer perimeter of the pueblo," April 12 Tr. at 55:7-8 (Robert). The United States conceded "that the locus of the accident is either private land or a state right-of-way that was derived from private land." April 12 Tr. at 56:5-21-23 (Murphy). The United States then provided its view that the the dispute is "whether or not that private land constitutes a peninsula that joins other private land on its western boundary or whether it is an inholding surrounded entirely by the reservation . . . ." April 12 Tr. at 57:23-58:3 (Murphy). The United States also offered that the dispute "does not make a difference to the Court's legal determination." April 12 Tr. at 58:7-8 (Murphy). The Court indicated that it would review who makes the factual determinations regarding the collision's locus and the appurtenant standard of proof. See April 12 Tr. at 56:5-6 (Court).

## LAW REGARDING "INDIAN COUNTRY" UNDER 18 U.S.C. § 1151

In the Indian Country Crimes Act, 18 U.S.C. § 1152, and the Major Crimes Act, 18 U.S.C. § 1153, "Congress conferred on the federal courts special criminal jurisdiction over offenses committed in Indian country." Cohen's Handbook of Federal Indian Law § 9.01, at 736-37 (Neil Jessup Newton et al. eds., 2012)("Cohen's Handbook"). For federal jurisdiction to lie, the crime must occur within "Indian country." 18 U.S.C. §§ 1152 & 1153. The demonstration of Indian country is "a major jurisdictional predicate for the application of much of federal Indian law." Cohen's Handbook § 9.02[1][b], at 738.

"'Indian country' is a term of art," Cohen's Handbook § 9.01, at 737 n.4, and 18 U.S.C. § 1151 provides the term's present definition.[4] According to § 1151,

---

[4]"In 1948, Congress codified the definition 'Indian Country' in the federal criminal code . . . to consolidate conflicting and inconsistent provisions of the code, and to incorporate Supreme Court decisions establishing the federal common-law definition of 'Indian country.'" Matthew L.M. Fletcher, Federal Indian Law § 7.1, at 291 ("Federal Indian Law")(footnote omitted).

> Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151. "The courts apply a unitary definition of the term 'Indian country' in both civil and criminal cases." Cohen's Handbook § 9.02[1][b], at 738 n.3. See Alaska v. Native Village of Venetie, 522 U.S. 520, 527 (1998)("Venetie")("Although this definition by its terms relates only to federal criminal jurisdiction, we have recognized that it also generally applies to questions of civil jurisdiction . . . .")(citing DeCoteau v. District Cnty. Court for Tenth Judicial Dist., 420 U.S. 425, 427 n.2 (1975)).

1.      **All Lands Within the Limits of Any Indian Reservation.**

Under 18 U.S.C. § 1151(a), "Indian country" includes all of the territory within the exterior boundaries of an Indian reservation.[5]  Regarding the term "Indian reservation," the Tenth Circuit has explained:

> The term "Indian reservation" has been used in various ways to define Indian country. Gradually the term has come to describe federally-protected Indian tribal lands meaning those lands which Congress has set apart for tribal and federal jurisdiction. Thus, for purposes of defining Indian country, the term simply refers to those lands which Congress intended to reserve for a tribe and over which Congress intended primary jurisdiction to rest in the federal and tribal governments.

Indian Country, U.S.A., Inc. v. State of Okl. ex rel. Oklahoma Tax Comm'n, 829 F.2d 967, 973 (10th Cir. 1987)(internal quotation marks and citations omitted).

---

[5]It does not include, however, that portion of an Indian reservation which extends into Canada.  See Grand River Enter. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 174 (2d Cir. 2005)("The fact that the Canadian part of the reservation may be given some special recognition by the Canadian government has no bearing on the question of whether Grand River is conducting business in 'Indian country,' as defined in § 1151.").

Under § 1151(a), any land contained within the exterior boundaries of an Indian reservation is "Indian country." Consequently, land that non-Indians own in fee simple -- i.e., land whose title was subject to "the issuance of any patent" -- is also Indian country if it lies "within the exterior boundaries of an Indian reservation." William C. Canby, American Indian Law § 7.B, at 140 (5th ed. 2009)("American Indian Law"). See Seymour, 368 U.S. at 356-57. In Seymour, the petitioner, Paul Seymour, filed a petition for a writ of habeas corpus, alleging that his state conviction was void for want of jurisdiction, because "the 'purported crime' of burglary for which he had been convicted was committed in 'Indian country'" and, therefore, was within the United States' exclusive jurisdiction. 368 U.S. at 352 (quoting 18 U.S.C. § 1151). Counsel for the State of Washington argued that the State retained jurisdiction over the matter, because "the particular parcel of land upon which this burglary was committed is held under a patent in fee by a non-Indian." Seymour, 368 U.S. at 357. The Supreme Court acknowledged that, at one time, Washington's contention "had the support of distinguished commentators on Indian Law," 368 U.S. at 357 (citing Felix S. Cohen, Handbook of Federal Indian Law 359 (1942)), but the Supreme Court concluded that "the issue has since been squarely put to rest by congressional enactment of the currently prevailing definition of Indian country in § 1151," Seymour, 368 U.S. at 357. Accordingly, "if the property is within boundaries of the reservation, it is Indian country irrespective of whether it is now held by a non-Indian." United States v. Webb, 219 F.3d 1127, 1131 (9th Cir. 2000)(citing 18 U.S.C. § 1151(a)).

Following Seymour, "the mere opening of a reservation for non-Indian settlement" does not remove the lands that non-Indians own in fee simple from Indian country under 18 U.S.C. § 1151(a); however, "a congressional decision to abandon the reservation status of those lands

does." <u>American Indian Law</u> § 7.B, at 141.  If Congress clearly acts to disestablish or diminish

reservation land, then the land is "outside the reservation boundary, and therefore outside of

Indian country under 18 U.S.C. § 1151(a)."  <u>United States v. Webb</u>, 219 F.3d at 1131.  <u>See</u>

<u>American Indian Law</u> § 7.B, at 144 ("When a reservation is diminished or disestablished, the

area excluded from the reservation is no longer Indian country under subsection (a) of 18 U.S.C.

§ 1151, which refers to 'all land within the limits of any Indian reservation.'").  In <u>Solem v.</u>

<u>Bartlett</u>, 465 U.S. 463 (1984), the Supreme Court explained:

> Our precedents in the area have established a fairly clean analytical structure for distinguishing those surplus land acts that diminished reservations from those acts that simply offered non-Indians the opportunity to purchase land within established reservation boundaries.  The first and governing principle is that only Congress can divest a reservation of its land and diminish its boundaries.  Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.

<u>Solem v. Bartlett</u>, 465 U.S. at 470 (citing <u>United States v. Celestine</u>, 215 U.S. 278, 285 (1909)).

When determining whether Congress acts to disestablish or diminish the limits of an

Indian reservation, the Supreme Court has provided the following guidance:

> The most probative evidence of congressional intent is the statutory language used to open the Indian lands.  Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation all unallotted opened lands.  When such language of cession is buttressed by an unconditional commitment from Congress to compensate the Indian tribe for its opened land, there is an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished.

<u>Solem v. Bartlett</u>, 465 U.S. at 470-71 (citations omitted).  The Supreme Court's "analysis of

surplus land acts requires that Congress clearly evince an 'intent to change boundaries' before

diminishment will be found."  <u>Solem v. Bartlett</u>, 465 U.S. at 470 (quoting <u>Rosebud Sioux Tribe</u>

<u>v. Kneip</u>, 430 U.S. 584, 615 (1977)).  Consequently, "diminishment will not be lightly inferred."

Solem v. Bartlett, 465 U.S. at 470. See, e.g., United States v. Long Elk, 565 F.2d 1032, 1039 (8th Cir. 1977)("We must conclude that Congress did not intend to disestablish the eastern portion of the Standing Rock Reservation."); id. at 1040 ("[W]e can find no such clear expression of congressional intent. We therefore must hold that the Act of 1913 did not diminish the size of the Standing Rock Indian Reservation."). Although "diminishment will not be lightly inferred," Solem v. Bartlett, 465 U.S. at 470, it can be inferred: the Supreme Court reached that conclusion with regard to congressional intent in both South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 344 (1998), and Hagen v. Utah, 510 U.S. 399, 420 (1994).

## 2. Dependent Indian Communities.

"A formal designation of Indian lands as a 'reservation' is not required for them to have Indian country status." Indian Country, U.S.A., Inc. v. State of Okl. ex rel. Oklahoma Tax Comm'n, 829 F.2d at 973 (citations omitted). Hence, when enacting 18 U.S.C. § 1151(b), Congress defined "Indian country" to include, not only all land within any Indian reservation's exterior boundaries, but also "all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state." 18 U.S.C. § 1151(b). The statute does not define "dependent Indian communities." 18 U.S.C. § 1151(b). Because § 1151(a) "covers reservations," and § 1151(c) "covers trusts and restricted fee allotments," however, § 1151(b) "appears to cover land outside of those categories." Cohen's Handbook § 3.04[2][c], at 193-94. The Court agrees with this reading of 18 U.S.C. § 1151. In fact, § 1151(b) "is a codification of the Supreme Court's holding in United States v. Sandoval." American Indian Law § 7.B, at 145 (citing United States v. Sandoval, 231 U.S. 28 (1913)("Sandoval")). Compare 18 U.S.C. § 1151(b), with Sandoval, 231 U.S. at 46 ("[T]he United States . . . [has] the power and the duty of exercising a fostering

care and protection over all dependent Indian communities within its borders, whether within its original territory or territory subsequently acquired, and whether within or without the limits of a State.").

In <u>Sandoval</u>, the Supreme Court confronted the question whether Pueblo lands were Indian country for the purposes of federal jurisdiction. <u>See</u> 231 U.S. at 36; <u>id.</u> at 38 ("The question to be considered, then, is whether the status of the Pueblo Indians and their lands is such that Congress competently can prohibit the introduction of intoxicating liquor into those lands notwithstanding the admission of New Mexico to statehood."). The Supreme Court recognized that the Pueblos "held their land in fee simple under Spanish grants" and that the Pueblo's lands were not formally designated as reservations. 231 U.S. at 39 ("The lands belonging to the several pueblos vary in quantity, but usually embrace amount 17,000 acres, held in communal, fee-simple ownership under grants from the King of Spain, made during the Spanish sovereignty, and confirmed by Congress since the acquisition of that territory by the United States.")(citations omitted); <u>id.</u> at 48 (recognizing that Pueblo land was held in "fee simple title . . . to the lands connected therewith, excepting such as are occupied under Executive orders . . . [and that] it is a communal title, no individual owning any separate tract").[6] Nevertheless, the Supreme Court

_____

[6]In <u>Venetie</u>, when looking back on its <u>Sandoval</u> opinion, the Supreme Court explained: "We indicated that the Pueblos' title was not fee simple title in the commonly understood sense of the term. Congress had recognized the Pueblos' title to their ancestral lands by statute, and Executive orders had reserved additional public lands 'for the [Pueblos'] use and occupancy.'" <u>Venetie</u>, 522 U.S. at 528 (quoting <u>Sandoval</u>, 231 U.S. at 39). In <u>Hydro Res., Inc. v. U.S. E.P.A.</u>, 608 F.3d 1131 (10th Cir. 2010)(en banc)("<u>HRI III</u>"), the Tenth Circuit also reviewed <u>Sandoval</u> and commented on the status of the Pueblos' lands:

> While not a formal Indian reservation or allotment that might fall into today's § 1151(a) and (c) categories, the Court noted that *Congress* had "recognized the Pueblos' titles to their ancestral lands by statute," *executive orders* had "reserved additional lands 'for the [Pueblos'] use and occupancy,'" and "*Congress* had enacted legislation . . . 'in the exercise of the Government's guardianship over

determined that the Pueblos had "been regarded and treated by the United States as requiring special consideration and protection, like other Indian communities."  231 U.S. at 39.  See id. at 47 ("[B]y an uniform course of action beginning as early as 1854 and continued up to the present time, the legislative and executive branches of the government have regarded and treated the Pueblos of New Mexico as dependent communities entitled to its aid and protection, like other Indian tribes . . . .").  Accordingly, the Supreme Court held that Congress has: (i) the power to recognize "dependent tribes requiring the guardianship and protection of the United States," 231 U.S. at 46; (ii) the exclusive power -- vis-à-vis the federal courts -- "to determine for itself when the guardianship which has been maintained over [protected Indian communities] shall cease," 231 U.S. at 46; and (iii) the power "to prohibit the introduction of liquor into . . . the lands of the Pueblos," 231 U.S.  at 48, without unlawfully encroaching upon New Mexico's traditional police power, see 231 U.S. at 49 ("Being a legitimate exercise of that power, the legislation in question does not encroach upon the police power of the state, or disturb the principle of equality among the states.").  Accordingly, the Supreme Court determined that the Pueblo lands were Indian country, subject to federal jurisdiction, even though the Pueblo lands were held in communal, fee-simple ownership and not formally designated as reservations.  See 231 U.S. at 48-49.

More recently, in Venetie, the Supreme Court delineated the elements of a dependent Indian community under 18 U.S.C. § 1151(b).  See Venetie, 522 U.S. at 526-31.  There, the Supreme Court stated:

> Since 18 U.S.C. § 1151 was enacted in 1948, we have not had an occasion to interpret the term "dependent Indian communities."  We now hold that it refers to

---

th[e] [Indian] tribes and their affairs' . . . including federal restrictions on the land's alienation."

HRI III, 608 F.3d at 1155 (alterations and emphasis in original)(quoting Venetie, 522 U.S. at 528 (quoting Sandoval, 231 U.S. at 39)).

a limited category of Indian lands that are neither reservations nor allotments, and that satisfy two requirements -- first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence. Our holding is based on our conclusion that in enacting § 1151, Congress codified these two requirements, which previously we had held necessary for a finding of "Indian country" generally.

Venetie, 522 U.S. at 527. The Supreme Court stated that in its prior opinions regarding the delineation of Indian country before 18 U.S.C. § 1151's enactment -- i.e., United States v. McGowan, 302 U.S. 535 (1938); United States v. Pelican, 232 U.S. 442 (1914); Sandoval, 231 U.S. 28; and Donnelly v. United States, 228 U.S. 243 (1913) -- the Court had "relied upon a finding of both a federal set-aside and a federal superintendence in concluding that the Indian lands in question constituted Indian country and that it was permissible for the Federal Government to exercise jurisdiction over them." Venetie, 522 U.S. at 530. The Supreme Court explained that § 1151 "does not purport to alter this definition of Indian country, but merely lists the three different categories of Indian country mentioned in our prior cases," Venetie, 522 U.S. at 530, namely: (i) Indian reservations, see Donnelly v. United States, 228 U.S. at 269; (ii) dependent Indian communities, see United States v. McGowan, 302 U.S. at 538-39; Sandoval, 231 U.S. at 46; and (iii) allotments, see United States v. Pelican, 232 U.S. at 449. The Supreme Court then concluded

[I]n enacting § 1151(b), Congress indicated that a federal set-aside *and* a federal superintendence requirement must be satisfied for a finding of a "dependent Indian community" -- just as those requirements had to be met for a finding of Indian country before 18 U.S.C. § 1151 was enacted. These requirements are reflected in the text of § 1151(b): The federal set-aside requirement ensures that the land in question is occupied by an "Indian community"; the federal superintendence requirement guarantees that the Indian community is sufficiently "dependent" on the Federal Government that the Federal Government and the Indians involved, rather than the States, are to exercise primary jurisdiction over the land in question.

Venetie, 522 U.S. at 530-31 (emphasis in original).

Before the Supreme Court issued <u>Venetie</u>, the Tenth Circuit had applied a multi-factored test to determine whether a particular area of land is a dependent Indian community under § 1151(b) and, therefore, Indian country. See <u>Pittsburg & Midway Coal Min. Co. v. Watchman</u>, 52 F.3d 1531, 1545 (10th Cir. 1995)("<u>Watchman</u>"). In that case, the Tenth Circuit stated:

> We now explicitly adopt the Eighth Circuit's four-prong test for determining what constitutes a dependent Indian community under 18 U.S.C. § 1151(b):
>
> > [W]hether a particular geographical area is a dependent Indian community depends on a consideration of several factors. These include: (1) whether the United States has retained title to the lands which it permits the Indians to occupy and authority to enact regulations and protective laws respecting this territory; (2) the nature of the area in question, the relationship of the inhabitants in the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area; (3) whether there is an element of cohesiveness . . . manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality; and (4) whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples.

<u>Watchman</u>, 52 F.3d at 1545 (alterations in original)(quoting <u>United States v. South Dakota</u>, 665 F.2d 837, 839 (8th Cir. 1981)(internal quotation marks omitted)). The Tenth Circuit additionally noted that other federal Courts of Appeal follow the United States Court of Appeals for the Eighth Circuit's framework to determine whether a geographical area is a dependent Indian community. See <u>Watchman</u>, 52 F.3d at 1545 (citing <u>United States v. Cook</u>, 922 F.2d 1026 (2d Cir. 1991), <u>cert. denied</u>, 500 U.S. 941 (1991); <u>Alaska v. Native Village of Venetie</u>, 856 F.2d 1384 (9th Cir. 1988); <u>United States v. Levesque</u>, 681 F.2d 75 (1st Cir.), <u>cert. denied</u>, 459 U.S. 1089 (1982)).

In addition to establishing a four-part test to ascertain whether a particular area of land is a dependent Indian community, in <u>Watchman</u>, the Tenth Circuit also established a threshold inquiry to determine the particular area that is subject to the four-part test. See <u>Watchman</u>, 52

F.3d at 1543.  At the outset, a court must articulate which particular geographical area it will

analyze as the relevant "community of reference."  Watchman, 52 F.3d at 1543.  In Watchman,

the Tenth Circuit stated two organizing inquiries to determine the community of reference: (i)

"the status of the area in question as a community," Watchman, 52 F.3d at 1543; and (ii) "the

community of reference within the context of the surrounding area," Watchman, 52 F.3d at

1544.[7]  Watchman involved the question whether a particular mine near to the Navajo Nation

was a dependent Indian community under § 1151(b), see 52 F.3d at 1541-46, and the Tenth

Circuit held that the district court had erred "by focusing too narrowly on the mine site," 52 F.3d

at 1545.  The Tenth Circuit explained:

> The South McKinley Mine does not exist in a vacuum.  Its workers must eat,
> sleep, shop, worship, and otherwise engage in life's daily routines.  The
> governmental or private entities that originally established, and continue to
> provide, the infrastructure required for the mine's ongoing operation are
> necessarily relevant to the dependent Indian community inquiry. . . . The Navajo
> Nation argues the entire Tsayatoh Chapter should have been used as the
> community of reference.  The resolution of this issue involves substantial factual
> determinations, making the district court the appropriate forum for its initial
> consideration. The Tsayatoh Chapter may prove to be the appropriate community
> of reference.  However, there may also be a clearly identifiable community that
> includes the mine site but is smaller than the entire Tsayatoh Chapter.  We leave
> this determination to the district court on remand.

---

[7]In United States v. Adair, 111 F.3d 770 (10th Cir. 1997), the Tenth Circuit added yet
another consideration to guide the inquiry regarding which precise geographical area should be
analyzed to determine if it is a dependent Indian community under § 1151(b).  Reviewing the
development of the community-of-reference test, the Tenth Circuit stated:

> [I]n each of the (few) cases we've applied the [community of reference] test,
> we've changed it.  Literally.  When creating the test in Watchman, we identified
> "two organizing principles" -- "the status of the area in question as a community"
> and "the context of the surrounding area."  Two years later, in Adair, we added
> another factor concerned with "the geographical definition of the area proposed as
> a community."

HRI III, 608 F.3d at 1163-64 (citations omitted).

Watchman, 52 F.3d at 1545 (alteration original).  See id. at 1542 ("We remand for the district court to choose a more appropriate community of reference . . . [and, under the four-part test,] to determine whether the South McKinley Mine site and the surrounding area is a dependent Indian community within the meaning of § 1151(b).").  Therefore, before the Supreme Court issued Venetie, the Tenth Circuit had established a framework to determine, for a particular geographic area, (i) how to determine the community of reference, see Watchman, 52 F.3d at 1545; and (ii) how to analyze whether that community is a dependent Indian community under § 1151(b), see Watchman, 52 F.3d at 1545.

After the Supreme Court decided Venetie and provided supervening guidance regarding how to determine whether a particular area is a dependent Indian community under § 1151(b), see Venetie, 522 U.S. at 526-31, the Tenth Circuit initially declined to jettison the entire framework it had established in Watchman.  See HRI, Inc. v. E.P.A., 198 F.3d 1224, 1248-49 (10th Cir. 2000), as amended on denial of reh'g and reh'g en banc (Mar. 30, 2000)("HRI I").  The Tenth Circuit explained:

> Although it appears that, in disapproving of the Ninth Circuit's multi-factor test [which was similar to the Watchman test] for identifying a dependent Indian community, Venetie may require some modification of the emphases in the second step of our dependent Indian community test in Watchman nothing in Venetie speaks to the propriety of the first element of that test -- determination of the proper community of reference.  Watchman explicitly declined to define with precision the proper community of reference for another mine site within the EO 709/744 area.  Instead, it simply rejected the district court's restriction of that community of reference to the mine site alone.  Presumably because of the categorical effect of the Alaska Native Claims Settlement Act ("ANCSA") on virtually all Alaskan native lands, the Supreme Court in Venetie was not even presented with the question of defining the proper means of determining a community of reference for analysis under § 1151(b).  Because Venetie does not speak directly to the issue, barring en banc review by this court, Watchman continues to require a "community of reference" analysis prior to determining whether land qualifies as a dependent Indian community under the set-aside and supervision requirements of 18 U.S.C. § 1151(b).

HRI I, 198 F.3d at 1248-49 (alteration added)(citations omitted).  See United States v. Arrieta, 436 F.3d 1246, 1250 n.2 (10th Cir. 2006)("Arrieta")("The two-part test established by the Supreme Court in Venetie partially replaces our earlier four-part test, enunciated in Watchman for determining whether land constitutes a dependent Indian community.")(emphasis added).

The Tenth Circuit then reviewed en banc whether Venetie had replaced in toto Watchman's framework to determine a "dependent Indian community" under § 1151(b).  See In Hydro Res., Inc. v. U.S. E.P.A., 608 F.3d 1131, 1143 (10th Cir. 2010)(en banc)("HRI III")("[W]e granted HRI's petition for *en banc* review . . . to tackle the one issue that panel thought it could not -- whether *Watchman*'s community of reference test remains an appropriate part of § 1151(b) analysis after *Venetie*.").  The Tenth Circuit stated: "We hold that *Watchman*'s community of reference test did not survive *Venetie* and that dependent Indian communities under § 1151(b) consist only of lands explicitly set aside for Indian use by Congress (or its designee) and federally superintended."  HRI III, 608 F.3d at 1148.  The Tenth Circuit then explained those two requirements in detail:

> What does it mean for the federal government to set aside land for Indian use and to superintend it? The Court noted that the set-aside requirement means that there must be "some explicit action by Congress (or the Executive, acting under delegated authority) . . . to create or to recognize" the "land in question" as part of a federally recognized and dependent Indian community.  Through an Act of Congress or some equally explicit executive action, then, the federal government must identify the land as "*set apart for the use of the Indians as such.*"  So, for example, land simply conveyed by Congress to individual Indians or tribes that they are then "free to use . . . for non-Indian purposes" or sell as they wish does not qualify.  While groups of Indians may very well live on such lands in socially and politically discrete communities, they do not live in "Indian country" because the land in question has not been explicitly set aside by Congress for use as a "dependent Indian community."  The superintendence requirement means that the federal government currently must be "actively control[ing] the lands in question, effectively acting as a guardian for the Indians."  This requirement, too, necessarily excludes lands that the government has conveyed without restriction to Indians or others because such lands do not implicate any sense of "guardian [ship]," "wardship[,] or trusteeship."

. . . .

> The set-aside requirement "ensures that the land in question is occupied by an 'Indian community.'" That is, the boundaries of the Indian community are demarcated by and delimited to those lands that are explicitly set aside by legislation or executive action for Indian use. The federal superintendence requirement "guarantees that the Indian community is sufficiently 'dependent' on the Federal Government that the Federal Government and the Indians involved, rather than the States, are to exercise primary jurisdiction over the land in question."

HRI III, 608 F.3d at 1148-49 (alterations in original)(citations omitted). The Tenth Circuit

concluded:

> Ultimately, *Venetie* compels us to abandon the community of reference test. Under the proper test we adopt today, only two questions are relevant in assessing claims of jurisdiction under § 1151(b): (1) Has Congress (or the Executive, acting pursuant to delegated authority) taken some action explicitly setting aside the land in question for Indian use? (2) Is the land in question superintended by the federal government?

HRI III, 608 F.3d at 1166. Now, it is clear that, in the Tenth Circuit, Venetie guides whether a

particular geographical area is Indian country under § 1151(b), without regard to independent

inquiry into a community of reference. See HRI III, 608 F.3d at 1166.

### 3.    **Allotments.**

Within the definition of "Indian country," 18 U.S.C. § 1151(c) includes "all Indian

allotments, the Indian titles to which have not been extinguished, including rights-of-way

running through the same." 18 U.S.C. § 1151(c). Unlike § 1151(a) and (b), "Indian country

status is tied specifically to land title . . . ." Cohen's Handbook § 3.04[2][c][iv], at 197. Cohen's

Handbook provides a useful summary:

>  The term "Indian allotment" has a reasonably precise meaning, referring to land owned by individual Indians and either held in trust by the United States or subject to a statutory restriction on alienation. Most allotments were originally carved out of tribal lands held in common, and many remain within the present boundaries of reservations. The phrase "the Indian titles to which have not been extinguished" refers to the termination of ownership by an individual Indian rather than to whether or not tribal aboriginal title has been extinguished. When

land is allotted in trust or fee, any tribal property interest in the allotted parcel is eliminated. Consequently, § 1151(c)'s major impact is on allotments not within a reservation or dependent Indian community. . . . Also the complete or partial disestablishment of some reservations left trust allotments outside reservation boundaries, but their Indian country status is still retained.

Cohen's Handbook § 3.04[2][c][iv], at 197. See American Indian Law § 7.B, at 147-48 ("Subsection (c) of § 1151 is self-explanatory; it includes within Indian country any allotment that is either still in trust (which necessarily means that it is beneficially owned by an Indian), or is owned in fee by an Indian with a restriction on alienation in favor of the United States.")(citing Yankton Sioux Tribe v. Gaffey, 188 F.3d 1010, 1022 (8th Cir. 1999)).

### 4. Burden of proof.

A criminal defendant charged under 18 U.S.C. §§ 1152 or 1153 may "challenge the actual location of the crime or the jurisdictional status of the land on the ground that the land in question is not 'Indian country.'" Cohen's Handbook § 9.02[1][b], at 739. The latter species of challenge raises a question of law that a court, not a jury, decides. See United States v. Roberts, 185 F.3d at 1139; Cohen's Handbook § 9.02[1][b], at 739. In United States v. Roberts, the Tenth Circuit explained that "[a]s a general matter, the trial court decides the jurisdictional status of a particular property or area and then leaves to the jury the factual determination of whether the alleged crime occurred at the site." United States v. Roberts, 185 F.3d at 1139 (citing United States v. Hernandez–Fundora, 58 F.3d 802, 812 (2d Cir. 1995)(concluding that district court may determine a federal prison falls within the special maritime and territorial jurisdiction of the United States, and remove that matter from the jury); United States v. Warren, 984 F.2d 325, 327 (9th Cir. 1993)(concluding that district court may determine a military base satisfies federal jurisdictional requirements); United States v. Bridges, 43 F.3d 1468, 1994 WL 687301, *1 (4th Cir. 1994)(table)(concluding that in a trial for robbery within the United States' special maritime

and territorial jurisdiction, "it is well established that a court may determine, as a matter of law, the existence of federal jurisdiction over the geographic area, but the locus of the offense within that area is for the trier of fact.")). Accordingly, in United States v. Roberts, the Tenth Circuit concluded that "a trial court also acts appropriately when it makes the jurisdictional ruling a particular tract of land or geographic area is Indian Country, and then instructs the jury to determine whether the alleged offense occurred there." United States v. Roberts, 185 F.3d at 1139. See id. at 1140 ("[T]he district court can find, as a matter of law, a geographic area or particular location is Indian Country, and then instruct the jury to determine factually whether the offense occurred there.").

"The party seeking to invoke the jurisdiction of a federal court must demonstrate that the case is within the court's jurisdiction." United States v. Bustillos, 31 F.3d 931, 933 (10th Cir. 1994). "The facts supporting jurisdiction must be affirmatively alleged, and if challenged, the burden is on the party claiming that the court has subject matter jurisdiction." United States v. Bustillos, 31 F.3d at 933 (citing McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936)). Accordingly, in a criminal prosecution under 18 U.S.C. §§ 1152 or 1153, the United States has the burden to prove by a preponderance of the evidence that the land on which the crime is alleged to have occurred is Indian country under 18 U.S.C. § 1151. Cf. Bustillos, 31 F.3d at 933 ("Consequently, the petitioner in this case has the burden of persuading this court by a preponderance of the evidence that the court has jurisdiction.")(citing McNutt v. General Motors Acceptance Corp., 298 U.S. at 189).

Once the district court has made the jurisdictional determination that "a particular tract of land or geographic area is Indian Country," United States v. Roberts, 185 F.3d at 1139, the United States then has the burden to prove beyond a reasonable doubt that the alleged crime

occurred on that particular tract of land or geographic area, see United States v. Frank, 901 F.2d

846, 849 (10th Cir. 1990)("[T]he evidence presented was sufficient from which a rational trier of

fact could find beyond a reasonable doubt that the rape charged in Count I occurred on Indian

land."). See also Cohen's Handbook § 9.02[1][b], at 739. "Challenges to the location of the

crime are addressed through the usual burden of proof for criminal offenses." Cohen's

Handbook § 9.02[1][b], at 739. "As is well known, the prosecution in a criminal case is required

to prove every element of the crime charged beyond a reasonable doubt." United States v.

Visinaiz, 428 F.3d 1300, 1308 (10th Cir. 2005)(citing In re Winship, 397 U.S. 358, 364 (1970)).

See United States v. Neha, No. CR 04-1677 JB, 2006 WL 1305034, at *2 (D.N.M. Apr. 19,

2006)(Browning, J.).

## LAW REGARDING THE LEGAL HISTORY OF THE PUEBLO LANDS

In Arrieta, the Tenth Circuit relayed a summary of the legal history of the Pueblo lands:

Title to the lands on which the Pueblo Indians reside was formally granted to
them by the King of Spain in 1689. Sandoval, 231 U.S. at 39; United States v.
Thompson, 941 F.2d 1074, 1075 (10th Cir. 1991). In 1848, the United States
acquired the territory of New Mexico from Mexico, including the lands on which
the Pueblo Indians resided. Treaty of Guadalupe Hidalgo, July 4, 1848, 9 Stat.
922; Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana, 472 U.S. 237, 240
(1985). In the Treaty of Guadalupe Hidalgo, the United States agreed to protect
the rights of Indians recognized by prior sovereigns. New Mexico v. Aamodt,
537 F.2d 1102, 1111 (10th Cir. 1976). Following this agreement, Congress
granted federal protection and supervision to the Pueblo Indians and their lands by
extending to the Pueblo the provisions of the Indian Nonintercourse Act, 25
U.S.C. § 177, which prohibits any loss or transfer of title of Indian lands except
by treaty or convention. Act of February 27, 1851, ch. 14, § 7, 9 Stat. 587; United
States ex rel Santa Ana Indian Pueblo v. Univ. of N.M., 731 F.2d 703, 706 (10th
Cir.1984).

In 1877, however, the Supreme Court held that the Pueblo Indians were not
"Indian tribes" within the meaning of the Nonintercourse Act, and therefore could
alienate their land without congressional approval. United States v. Joseph, 94
U.S. 614, 618 (1876). Although the decision was later overruled, see United
States v. Candelaria, 271 U.S. 432, 441 (1926), approximately 3,000 non-Indians
acquired putative title to Pueblo land between 1880 and 1910. See Mountain

States Tel. & Tel., 472 U.S. at 243. The validity of title transferred to non-Indians came into question in 1913 when the Court held in Sandoval that the Pueblo are a dependent Indian community entitled to the aid and protection of the federal government and subject to congressional control. Sandoval, 231 U.S. at 47. To settle the status of Pueblo lands, Congress enacted the Pueblo Lands Act of 1924 ("PLA"). Pueblo Lands Act of June 7, 1924, ch. 331, 43 Stat. 636. The PLA established the Pueblo Lands Board ("Board") to resolve conflicting claims to Pueblo lands. Id. §§ 2, 6, 43 Stat. at 633-37.

The Board issued patents to quiet title to land in favor of non-Indians who adversely possessed land and paid taxes on the land from 1889 to 1924 or who had color of title to the land from 1902 to 1924. Id. § 4, 43 Stat. at 637; Mountain States Tel. & Tel., 472 U.S. at 244-45. The Pueblos' rights to such land were extinguished. PLA § 4, 43 Stat. at 637; Mountain States Tel. & Tel., 472 U.S. at 244. The Pueblo retained title to all lands not patented to non-Indians. Consequently, pockets of privately owned, non-Indian land lie amidst Pueblo lands.

Arrieta, 436 F.3d at 1249-50. See generally Cohen's Handbook § 4.07[2][b], at 313-321.

The Tenth Circuit has also made it clear that the Pueblo's lands are "Indian country," being "dependent Indian communities" under § 1151(b), not reservations under § 1151(a). HRI III, 608 F.3d at 1155. In HRI III, when relaying the Supreme Court's decisions in Venetie, 522 U.S. at 528, and Sandoval, 231 U.S. at 36-39, the Tenth Circuit explained:

While not a formal Indian reservation or allotment that might fall into today's § 1151(a) and (c) categories, the Court noted that *Congress* had "recognized the Pueblos' titles to their ancestral lands by statute," *executive orders* had "reserved additional lands 'for the [Pueblos'] use and occupancy,'" and "*Congress* had enacted legislation . . . 'in the exercise of the Government's guardianship over th[e] [Indian] tribes and their affairs' . . . including federal restrictions on the land's alienation." In this way, the Court held, Congress had taken deliberate and independent actions to set aside the land in question and guarantee its federal superintendence, thereby rendering it a federally dependent Indian community.

HRI III, 608 F.3d at 1155 (quoting Venetie, 522 U.S. at 528 (quoting Sandoval, 231 U.S. at 39)(emphasis in original)). See generally Cohen's Handbook § 4.07[2][b], at 313-321.

**LAW REGARDING CRIMINAL JURISDICTION ON THE PUEBLO LANDS**

On December 20, 2005, Congress amended the Pueblo Lands Act, 43 Stat. 636 (1924), to

clarify criminal jurisdiction on Pueblo lands.  See Indian Pueblo Land Act Amendments of 2005,

Pub. L. No. 109-133, 119 Stat. 2573 (Dec. 20, 2005), codified at 25 U.S.C. § 331 Note.  The

amendment provides:

> The Act of June 7, 1924 (43 Stat. 636, chapter 331), is amended by adding at the end the following:

**"SEC. 20. CRIMINAL JURISDICTION.**

> "(a) IN GENERAL. -- Except as otherwise provided by Congress, jurisdiction over offenses committed anywhere within the exterior boundaries of any grant from a prior sovereign, as confirmed by Congress or the Court of Private Land Claims to a Pueblo Indian tribe of New Mexico, shall be as provided in this section.

> "(b) JURISDICTION OF THE PUEBLO. -- The Pueblo has jurisdiction, as an act of the Pueblos' inherent power as an Indian tribe, over any offense committed by a member of the Pueblo or an Indian as defined in title 25, sections 1301(2) and 1301(4), or by any other Indian-owned entity.

> "(c) JURISDICTION OF THE UNITED STATES. -- The United States has jurisdiction over any offense described in chapter 53 of title 18, United States Code, committed by or against an Indian as defined in title 25, sections 1301(2) and 1301(4) or any Indian-owned entity, or that involves any Indian property or interest.

> "(d) JURISDICTION OF THE STATE OF NEW MEXICO. -- The State of New Mexico shall have jurisdiction over any offense committed by a person who is not a member of a Pueblo or an Indian as defined in title 25, sections 1301(2) and 1301(4), which offense is not subject to the jurisdiction of the United States."

25 U.S.C. § 331 Note.

The Tenth Circuit has stated that this statute "provides for federal and tribal criminal

jurisdiction over offenses committed involving Indians 'anywhere within the exterior boundaries

of any grant from a prior sovereign, as confirmed by Congress or the Court of Private Land

Claims[, an Article I court established by Congress,] to a Pueblo Indian tribe of New Mexico.'"

HRI III, 608 F.3d at 1157 (quoting 25 U.S.C. § 331 Note).

Further, in State v. Romero, 2006-NMSC-039, 142 P.3d 887, the Supreme Court of New

Mexico held that "[t]he privately-held fee lands within the exterior boundaries of both Taos and Pojoaque Pueblos . . . remain Indian country, and the State does not have jurisdiction to prosecute the alleged crimes [committed by Native Americans] occurring there." State v. Romero, 2006-NMSC-039, ¶ 26, 142 P.3d at 896. Justice Chávez, concurring in the Supreme Court of New Mexico's result, read the Indian Pueblo Land Act Amendments of 2005 to support that conclusion:

> Congress confirmed criminal jurisdiction in the Pueblos and the United States and specifically noted that the State of New Mexico only has jurisdiction over an offense committed by a person who is not a member of a Pueblo or an Indian, provided the offense is not subject to the jurisdiction of the United States.

State v. Romero, 2006-NMSC-039, ¶ 32, 142 P.3d 887, 899, as revised (Sept. 12, 2006)(Chávez, J., concurring)(citing 25 U.S.C. § 331 Note).

Furthermore, the legislative history of the amendment is instructive. Senate Report 108-406 explains:

> Section 5 amends the Act of June 7, 1924 (43 Stat. 636, chapter 331) also known as the Indian Pueblo Lands Act of 1924, to clarify the uncertainty and potential law enforcement problems resulting from a Federal district court decision in the case of the United States v. Gutierrez No. CR 00–375 LH (D.N.M. Dec. 1, 2000).

> The decision overturned precedent regarding the jurisdictional status of the lands within the boundaries of New Mexico Pueblo land grants and resulted in creating a potential void in criminal jurisdiction. Section 5 provides a clarification of the Pueblos regarding criminal jurisdiction on New Mexico Pueblo lands.

> . . . .

> The Gutierrez decision created uncertainty and the potential for a void in criminal jurisdiction on Pueblo lands.[8] The proposed amendment to the Indian Pueblo

---

[8]In United State v. Gutierrez, 1:00-mj-00375-RLP (D.N.M. June 21, 2000)("Order Denying Motion to Dismiss"), the Honorable Richard L. Puglisi, United States Magistrate Judge for the United States District Court for the District of New Mexico, rejected Defendant Jose Gutierrez' argument that the court lacked jurisdiction, because "1001 Calle Sierra Vista in Espanola New Mexico is within Indian country pursuant to 18 U.S.C. § 1151." Order Denying Motion to Dismiss at 1. Judge Puglisi also concluded, "that irrespective of the issuance of any

Lands Act makes clear that the Pueblos have jurisdiction, as part of the Pueblos' inherent power as an Indian tribe, over any offense committed by a member of the Pueblo or of another Federally-recognized Indian tribe, or by any other Indian-owned entity committed anywhere within the exterior boundaries of any grant to a Pueblo from a prior sovereign, as confirmed by Congress or the Court of Private Lands Claims.

The legislation also makes clear that the United States has jurisdiction over any offense within these grants described in chapter 53 of title 18, United States Code, committed by or against a member of any federally recognized Indian tribe or any Indian-owned entity, or that involves any Indian property or interest. Finally, the legislation makes clear that the State of New Mexico shall have jurisdiction over any offense within these grants committed by a person who is not a member of a Federally-recognized Indian tribe, provided that the offense is not subject to the jurisdiction of the United States.

Nothing in this amendment is intended to diminish the scope of Pueblo civil jurisdiction within the exterior boundaries of Pueblo grants, which is defined by Federal and Tribal laws and court decisions.

S. REP. 108-406, at 3 & n.1 (2004). Similarly, the H.R. Rep. No. 109-298(I) provides:

This provision makes it clear that the Indian Pueblo tribal government has criminal jurisdiction over any offense committed by a member of the Pueblo or an Indian in general and that the U.S. has jurisdiction over any offense by or against an Indian not of that pueblo. The State of New Mexico has criminal jurisdiction over any offense committed by a person who is a non-Indian.

H.R. REP. No. 109-298(I), at 231.

## **LAW REGARDING STATUTORY INTEPRETATION**

When interpreting statutes, the Court must start with the plain language.

We review issues of statutory construction de novo, interpret[ing] the words of the statute in light of the purposes Congress sought to serve. In so doing, we begin with the language employed by Congress, and we read the words of the statute in their context and with a view to their place in the overall statutory scheme.

---

patent on Indian land, exclusive federal jurisdiction continues absent congressional action to abdicate jurisdiction." Order Denying Motion to Dismiss at 2. The Court is uncertain how this order or reasoning triggered Congress' concern of a potential void in criminal jurisdiction in the Pueblos. Nevertheless, Senate Report 108-406 suggests that the court's holding that it had jurisdiction in United State v. Gutierrez somehow caused Congress to enact the Indian Pueblo Land Act Amendments of 2005, 25 U.S.C. § 331 Note. See S. REP. 108-406, at 3 & n.1 (2004).

Been v. O.K. Industries, Inc., 495 F.3d 1217, 1227 (10th Cir. 2007)(internal quotation marks and citations omitted). See United States v. Wright, 48 F.3d 254, 255 (7th Cir. 1995). "It is well established that when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms." Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004)(internal quotation marks omitted). See In re Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643 (1978)(noting that a court may not disregard the statute's plain language unless a literal application of the statutory language "would lead to absurd results . . . or would thwart the obvious purpose of the statute")(internal quotation marks omitted). "Courts indulge a strong presumption that Congress expresses its intent through the language it chooses. Therefore, when the terms of a statute are clear and unambiguous, our inquiry ends and we should stick to our duty of enforcing the terms of the statute as Congress has drafted it." United Kingdom Ministry of Defence v. Trimble Navigation Ltd., 422 F.3d 165, 171 (4th Cir. 2005)(internal quotations omitted). See Public Lands Council v. Babbitt, 167 F.3d 1287, 1314 (10th Cir.1999)("[W]e assume that the words chosen by Congress are employed in their ordinary sense and accurately express Congress's legislative purpose."). See also Hamdan v. Chertoff, 626 F. Supp. 2d 1119, 1126 (D.N.M. 2007)(Browning, J.).

## LAW REGARDING AN INDICTMENT'S SUFFICIENCY

The Sixth Amendment to the Constitution of the United States of America provides that, "in all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. "This constitutional protection is implemented by the requirement of Rule 7(c)(1) that the indictment or information 'be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" Charles A. Wright and Andrew D. Leipold, Federal Practice and Procedure: Criminal 4th § 125,

at 542 (2008)(quoting Fed. R. Crim. P. 7(c)(1)).  Rule 7(c) of the Federal Rules of Criminal

Procedure provides:

> **(c) Nature and Contents.**
>
> **(1) In General.**  The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government.  It need not contain a formal introduction or conclusion.  A count may incorporate by reference an allegation made in another count.  A count may allege that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means.  For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated.  For purposes of an indictment referred to in section 3282 of title 18, United States Code, for which the identity of the defendant is unknown, it shall be sufficient for the indictment to describe the defendant as an individual whose name is unknown, but who has a particular DNA profile, as that term is defined in that section 3282.
>
> **(2) Citation Error.**  Unless the defendant was misled and thereby prejudiced, neither an error in a citation nor a citation's omission is a ground to dismiss the indictment or information or to reverse a conviction.

Fed. R. Crim. P. 7(c).

"'An indictment is sufficient if it sets forth the elements of the offense charged, puts the

defendant on fair notice of the charges against which he must defend, and enables the defendant

to assert a double jeopardy defense.'"  United States v. Todd, 446 F.3d 1062, 1067 (10th

Cir. 2006)(citing United States v. Dashney, 117 F.3d 1197, 1205 (10th Cir. 1997)).  Further, an

indictment "need not quote the statutory language to be legally sufficient."  United States v.

Bullock, 914 F.2d 1413, 1414 (10th Cir. 1990)(citing Hamling v. United States, 418 U.S. 87

(1974)).  The Tenth Circuit also has made clear that, when "[i]nterpreting an indictment, [courts]

are governed by practical rather than technical considerations."  United States v. Phillips, 869

F.2d 1361, 1364 (10th Cir. 1988)(alterations added)(citing United States v. Martin, 783 F.2d

1449, 1452 (9th Cir. 1986)("Charging documents are tested by whether they apprise the

defendant of what evidence he must be prepared to meet. . . . An indictment should be read in its entirety, construed according to common sense and interpreted to include facts which are necessarily implied."); United States v. Maggitt, 784 F.2d 590, 598 (5th Cir. 1986)("An indictment is to be read in light of its purpose, which is to inform the accused of the charges.")).

## ANALYSIS

The Motion presents a straightforward issue: does the Court have jurisdiction over the offense that the United States alleges Antonio committed?  A federal grand jury charged Antonio with violations of 18 U.S.C. §§ 1153 and 1111.  See Indictment at 1.  In the Indian Pueblo Land Act Amendments of 2005, Congress specified that the United States has jurisdiction over an alleged violation of 18 U.S.C. § 1153 committed by "an Indian as defined in title 25, sections 1301(2) and 1301(4)," so long as the defendant commits the offense "anywhere within the exterior boundaries of any grant from a prior sovereign, as confirmed by Congress or the Court of Private Land Claims to a Pueblo Indian tribe of New Mexico."  25 U.S.C. § 331 Note.  The Court's jurisdiction depends, therefore, on whether the collision occurred "within the exterior boundaries" of the grant from a prior sovereign to the Sandia Pueblo, "as confirmed by Congress or the Court of Private Land Claims."  25 U.S.C. § 331 Note.  Antonio does not contest that the collision site is within the Sandia Pueblo's southern and northern boundaries, but argues that the collision site "is not within the [e]xterior [b]oundary of the Sandia Pueblo but rather is a non-Indian Country [p]eninsula" that protrudes into the Sandia Pueblo from the west.  Motion at 5.  The Court concludes that the collision occurred within the exterior boundaries of the 1748 Spanish grant to the Sandia Pueblo, which Congress confirmed in the Act of December 22, 1858, 11 Stat. 374, 374 (1859).  Accordingly, under the Indian Pueblo Land Act Amendments of 2005, the Court has jurisdiction over this criminal matter.  See 25 U.S.C. § 331 Note.  The Court

additionally concludes that the collision occurred within the current exterior boundaries of the Sandia Pueblo. The Court further concludes that the Indictment is sufficient under the requirements of the Sixth Amendment and of rule 7(c)(1) of the Federal Rules of Criminal Procedure.

## I. THE INDIAN PUEBLO LAND ACT AMENDMENTS OF 2005 CONTROL THE COURT'S JURISDICTION IN THIS MATTER.

In the Indian Pueblo Land Act Amendments of 2005, Congress provides the test by which the Court determines whether it has jurisdiction over alleged violations of 18 U.S.C. § 1153 on Pueblo land. See 25 U.S.C. § 331 Note. In comparison to the jurisdictional analysis that preceded the 2005 amendments, the test is relatively straightforward. Compare 25 U.S.C. § 331 Note, with Arrieta, 436 F.3d at 1250 (analyzing whether, under 18 U.S.C. § 1151(b), "Shady Lane can be classified as a 'dependent Indian community' when it is maintained by Santa Fe as a county road"). See Arrieta, 436 F.3d at 1251 ("Congress amended the Pueblo Lands Act to clarify federal, state, and Pueblo criminal jurisdiction.")(citing Pub.L. No. 109-133, 119 Stat. 2573 (Dec. 20, 2005)).[9] If the United States alleges that "an Indian as defined in title 25, sections 1301(2) and 1301(4)" violates 18 U.S.C. § 1153, and the alleged violation occurs "anywhere within the exterior boundaries of any grant from a prior sovereign, as confirmed by Congress or the Court of Private Land Claims to a Pueblo Indian tribe of New Mexico," then a federal court has jurisdiction over the matter. 25 U.S.C. § 331 Note.

---

[9]In Arrieta, the Tenth Circuit acknowledged that, "[w]hile this appeal was pending, Congress amended the Pueblo Lands Act to clarify federal, state, and Pueblo criminal jurisdiction." Arrieta, 436 F.3d at 1251 (citation omitted). The Tenth Circuit "ordered the parties to file supplemental briefs on the retroactivity and implications of this amendment," and noted, in its opinion, that "[b]oth Mr. Arrieta and the government agree that the amendment does not apply retroactively to confer federal jurisdiction over Mr. Arrieta's crime." Arrieta, 436 F.3d at 1251. The Tenth Circuit concluded, therefore, that, "[b]ecause neither party argues the amendment applies to this case, and because the amendment is consistent with the result we reach under prior law, we need not further consider the amendment." Arrieta, 436 F.3d at 1251.

In light of the Indian Pueblo Land Act Amendments of 2005, 25 U.S.C. § 331 Note, Antonio's argument that the collision site is located within a peninsula of private land, which encompasses the Pedro Garcia Parcel, Private Claim 364, and protrudes into the Sandia Pueblo from the west, is not determinative of the Court's subject-matter jurisdiction. The jurisdictional inquiry is not whether the collision site is located within the Sandia Pueblo's present-day boundaries; rather, the jurisdictional inquiry is whether the collision site is located "anywhere within the exterior boundaries of any grant from a prior sovereign, as confirmed by Congress or the Court of Private Land Claims to a Pueblo Indian tribe of New Mexico." 25 U.S.C. § 331 Note. In the Indian Pueblo Land Act Amendments of 2005, 25 U.S.C. § 331 Note, Congress instructs the federal courts, when determining federal criminal jurisdiction over Pueblo lands, to ensure that Congress or the Court of Private Land Claims confirmed "the exterior boundaries of any grant from a prior sovereign," not any Pueblo's present-day boundaries as defined by the aggregate of its communal fee-simple holdings. 25 U.S.C. § 331 Note. See United States v. Husted, 545 F.3d 1240, 1245 (10th Cir. 2008)("When a statute is unambiguous . . . we must apply its plain meaning except in the rarest of cases; after all, there can be no greater statement of legislative intent than an unambiguous statute itself."). Moreover, Congress' intent in enacting the Indian Pueblo Land Act Amendments of 2005 was "to clarify the uncertainty and potential law enforcement problems" on the New Mexico Pueblos' lands. S. REP. 108-406, at 3 & n.1 (2004). Congress achieved that purpose by cinching criminal jurisdiction to "the exterior boundaries of any grant from a prior sovereign," so long as Congress or the Court of Private Land Claims confirmed that grant. 25 U.S.C. § 331 Note. The Court would frustrate Congress' intent if the Court considered as conclusive to its jurisdictional determination Antonio's contention that, after the original "grant from a prior sovereign," subsequent land transfers

created a peninsula of private land protruding into the Sandia Pueblo's land and, thereby, altering its original, exterior boundaries. 25 U.S.C. § 331 Note. See Wright v. Fed. Bureau of Prisons, 451 F.3d 1231, 1233 (10th Cir. 2006)("[T]he court 'must give effect to the unambiguously expressed intent of Congress.'")(quoting Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000)).

Because the United States alleges that Antonio is "an Indian" and violated 18 U.S.C. § 1153, and because the parties do not dispute that the alleged crime occurred at the intersection of New Mexico Highway 313 and Wilda Drive in Bernalillo County, New Mexico, the Court has jurisdiction if this site is located "within the exterior boundaries of any grant from a prior sovereign" to the Sandia Pueblo, "as confirmed by Congress or the Court of Private Land Claims." 25 U.S.C. § 331 Note. Accordingly, the Court turns to that rather anachronistic question.

## II. THE COLLISION SITE IS LOCATED WITHIN THE EXTERIOR BOUNDARIES OF THE 1748 SPANISH GRANT TO THE SANDIA PUEBLO THAT CONGRESS CONFIRMED IN THE ACT OF DECEMBER 22, 1858.

The Court concludes that it has jurisdiction, because the collision site is located within the exterior boundaries of the May 16, 1748, grant to the Sandia Pueblo, as confirmed by the Act of December 22, 1858, 11 Stat. at 374. See 25 U.S.C. § 331 Note. Cohen's Handbook § 4.07[2][b], at 313, relates the general history of Congressional confirmation of the Pueblo land grants:

> Congress confirmed Pueblo land grants acquired under the laws, usages, and customs of Spain and Mexico between 1858 and 1931. As one court has written, these congressional confirmations did not give any lands to these Pueblo Indians, but merely validated title to land grants which the Pueblos already owned. The United States was obliged under principles of international law to confirm the bona fide grants of prior sovereigns in order to give effect to the 1848 Treaty with Mexico.

Cohen's Handbook § 4.07[2][b], at 313 (internal quotation marks and footnotes omitted).

The Spanish Archives of New Mexico include the 1748 grant to the Sandia Pueblo.  See 1748 Pueblo of Sandia Grant.  In pertinent part, the 1748 Pueblo of Sandia Grant, which was memorialized by Bernado Antonio de Bustamante y Tagle, provides:

> In this pueblo and said mission of Nuestra Señora de los Dolores and San Antonio de Sandia on the 16th day of the month of May of 1748 I the Lieutenant General Don Bernardo Antonio de Bustamante y Tagle, by special commission which I hold from the Senor Sergeant Major Don Joachín Codallos y Rabál, Governor and Captain General of this Kingdom of New Mexico to do so having made myself aware and informed concerning the petition of the Reverend Minister Father, Delegate Commissary and Procurator General of this Custody and giving compliance to all that which the said Minister Reverend Padre petitions, and complying with that which the above proceedings demand, being in this said mission for the royal and personal possession which I should give, ordered the settlers who are nearest, who are those who reside in this said pueblo on the southern and northern portions, who being present I notified of the commission which I hold to give the said possession to the Moquino sons who are gathered together to resettle the said mission and to their minister and that if anything which should give them damage would take place that they explain the right which they may have, to which they responded that notwithstanding that the measurements included some granted and purchased land, they would cede them without any controversy since the order is superior to a recourse they could allege by law.  And there being no further opposition which I verbally inquired as I had been ordered to do, I proceeded to give royal and personal possession, first proceeding to give the name and avocation to the said new mission in perpetuity, placing on it the name "Nuestra Señora de los Dolores y San Antonio de Sandia," and this nomination made, all the recently converted Indians of the said nation as resettlers gathered together and their father minister who is the Reverend Father Preacher Fray Juan Joseph Hernández, whom I led by the hand and in the name of his Majesty (may God guard him) I proceeded over the said land, I shouted and they shouted, threw rocks and pulled up grass and in a loud voice shouted many times "Long live the King, our Lord," and they received the royal possession without any opposition.  The leagues conceded for a formal pueblo were measured and the cordels [measuring cords] extended to the west wind as far as the Rio del Norte, which is the boundary, having no more than 12 cordels of 120 Castillian varas each one which consisted of 1,440 varas, and in order to complete those which were lacking in this direction it was necessary to increase the leagues which pertain to the north and south winds equally so that the Spanish settler grantees would not be injured some more than others.  The land which is encompassed in these three winds [directions] is all for raising wheat with the conveniences of water for the purpose of the land.  And in order to perpetuate the memories and the designations I ordered them to place monument markers,

mounds of mud and stone of the height of a man, with wooden crosses on top, these being on the north facing the point of the cañada which is commonly called "del Agua," and on the south facing the mouth of the Cañada de Juan Tabovo, and on the east the sierra madre called Sandia, within which limits are the conveniences of pastures, woods, waters and watering places in abundance in order to maintain their stock, both large and small and a horse herd, all of which Moquino Indian neophytes who are congregated as stated, so that they may enjoy them for themselves, their children, heirs and successors. Those who were present were found to be 350 persons, young and old, who comprise 70 families to whom jointly I conceded, pronounced and gave the royal possession in the name of his Majesty which is to be for them sufficient title so that neither now nor at any time can any occasion arise in which another person or persons will interfere with or enter into the designated boundaries. And being placed in possession and so that for all time it is certain I executed this proceeding, the official witnesses being the squadron corporal Antonio de Armenta and the soldier Juan Samon and I signed it with those of my assistance with whom I acted as jues receptor for lack of a royal and public scribe for there is none in this kingdom. Dated as above I certify. Bernado Antonio de Bustamante y Tagle, Jues Receptor (rubric). Witness Ysidro Sánchez Tagle (rubric). Witness: Pedro Tafolla (rubric). An attestation is made which is remitted to the superior government of this New Spain.

1748 Pueblo of Sandia Grant at 4-6 (emphasis added).

In the Act of July 22, 1854, Congress created the office of the Surveyor-General for New Mexico. See Act of July 22, 1854, 10 Stat. 308, 308 (1854). Congress charged the Surveyor-General of New Mexico

to ascertain the origin, nature, character, and extent of all claims to lands under the laws, usages, and customs of Spain and Mexico . . . [and to] make a report in regard to all pueblos existing in the Territory, showing the extent and locality of each, stating the number of inhabitants in the said pueblos, respectively, and the nature of their titles to the land . . . which report shall be laid before Congress for such action thereon as may be deemed just and proper, with a view to confirm *bona fide* grants, and give full effect to the treaty of eighteen hundred and forty-eight between the United States and Mexico; and until the final action of Congress on such claims, all lands covered thereby shall be reserved from sale or other disposal by the government.

10 Stat. at 309. After receiving the Secretary of the Interior's report, in the Act of December 22, 1858, Congress declared that the "land claims" designated as the "Pueblo of Sandia in the county of Bernalillo . . . reported upon favorably by the . . . surveyor-general [of New Mexico], on the

thirtieth of November, eighteen hundred and fifty-six . . . [are] hereby confirmed."  Act of December 22, 1858, 11 Stat. 374, 374 (1859).  See Pueblo of Sandia Boundary, 96 Interior Dec. at 333, 1988 WL 410394, at *2.

In the Act of December 22, 1858, Congress confirmed the 1748 Spanish grant to the Sandia Pueblo, which were memorialized in documents provided to Congress by the Secretary of the Interior.  See Pueblo of Sandia Boundary, 96 Interior Dec. at 333, 1988 WL 410394, at *2 (citing 1748 Pueblo of Sandia Grant, H.R. Executive Document No. 36, 34th Cong., 3d Sess. (1857)("H.R. Exec. Doc. No. 36")).  In light of the documents memorializing the 1748 grant, the Department of the Interior's Office of the Solicitor states that, "[o]n May 16, 1748, Lieutenant General Bustamante performed the rituals then associated with a grant from Spain as memorialized in a document known as the Act of Possession."  Pueblo of Sandia Boundary, 96 Interior Dec. at  347, 1988 WL 410394, at *14.  The "Act of Possession" makes plain that the western boundary is "a natural feature, the Rio Grande River."  Pueblo of Sandia Boundary, 96 Interior Dec. at 350, 1988 WL 410394, at *16.  See 1748 Pueblo of Sandia Grant at 5 ("The leagues conceded for a formal pueblo were measured and the cordels [measuring cords] extended to the west wind as far as the Rio del Norte, which is the boundary . . . ."); Stanley M. Hordes, History of the Boundaries of the Pueblo of Sandía, 1748-1860, at 5-7 (1996).

The collision occurred at the intersection of New Mexico Highway 313 and Wilda Drive in Bernalillo County, New Mexico, which lies east of the Rio Grande.  See Fed. R. Evid. 201(b)(1)("The court may judicially notice a fact that is not subject to reasonable dispute because it is generally known within the trial court's territorial jurisdiction.").  The Court concludes that the collision site, therefore, lies within the exterior boundaries of the 1748 grant to the Sandia Pueblo, because that grant, as Congress confirmed it, established that the Sandia Pueblo's

western boundary is the Rio Grande.  See Pueblo of Sandia Boundary, 96 Interior Dec. at 350,

1988 WL 410394, at *16.  See also 11 Stat. at 374; H.R. Exec. Doc. No. 36.  Under 25 U.S.C. §

331 Note, therefore, the Court has jurisdiction.

The Court is aware that the Rio Grande changes its shape over time and that, directly

west of the collision site, the Rio Grande's channel has moved west since 1914.[10]  Antonio has

not proffered argument or evidence, however, that the collision site is west of the Rio Grande's

1748 channel.  The Court nonetheless clarifies that such argument is not determinative.  First, the

1748 Pueblo of Sandia Grant established that the Rio Grande is the grant's western boundary, see

1748 Pueblo of Sandia Grant at 5, and Congress confirmed that grant in 1858, see 11 Stat. at 374.

Second, the Court does not read the 2005 amendment, enacted to clarify criminal jurisdiction in

the Pueblos, to make criminal jurisdiction in the Sandia Pueblo dependent upon the contingency

of the precise shape of the Rio Grande in 1748.  See 25 U.S.C. § 331 Note.  In HRI III, the Tenth

Circuit made clear that it is "impermissible" for "the scope of federal criminal jurisdiction" to be

"uncertain and unpredictable," because that would contravene the Supreme Court's "repeated

admonitions elsewhere that criminal statutes merit more concrete and precise constructions."

HRI III, 608 F.3d at 1148.  See generally Bouie v. City of Columbia, 378 U.S. 347, 351-52

(1964)(explaining the due process constraints on penal statutes that fail to provide fair warning).

Accordingly, the Court has jurisdiction over this matter, because: (i) Congress affixed

_____

[10]See Original Field Notes of the Dependent Resurvey of a Portion of the South Boundary of the Sandia Pueblo Grant, a Portion of the North Boundary, a Portion of the Subdivisional Lines, and Certain Private Claim Boundaries within the Sandia Pueblo grant in Section 2, and a Metes-and-Bounds Survey in Section 2, Township 11 North, Range 3 East, of the New Mexico Principal Meridian, in the State of New Mexico at 12, 16, 43-44,  United States Department of the Interior, Bureau of Land Management, New Mexico State Office (executed by Lonnie Bitsoi)(survey completed April 20, 2004), https://glorecords.blm.gov/details/survey/default.aspx?dm_id=84672&sid=pcalp2eb.02b  (noting that in 1914, the western boundary of the Pedro Garcia Claim, Private Claim 364, was the left bank of the Rio Grande).

criminal jurisdiction in the Sandia Pueblo to the exterior boundaries of the 1748 grant that Congress confirmed, see 25 U.S.C. § 331 Note; 11 Stat. at 374; (ii) the 1748 grant established the western boundary of the Sandia Pueblo as the Rio Grande, see 1748 Pueblo of Sandia Grant at 5; see also Pueblo of Sandia Boundary, 96 Interior Dec. at 350, 1988 WL 410394, at *16; and (iii) the collision site is located within that boundary.

### III. THE COLLISION SITE IS LOCATED WITHIN THE CURRENT EXTERIOR BOUNDARIES OF THE SANDIA PUEBLO AND NOT WITHIN A PENINSULA OF PRIVATE LAND THAT PROTRUDES INTO THE SANDIA PUEBLO FROM THE WEST.

In the Motion, Antonio does not challenge that the collision site lies within the Sandia Pueblo's southern and northern boundaries; rather, he argues that the collision site "is not within the [e]xterior [b]oundary of the Sandia Pueblo but rather is a non-Indian Country [p]eninsula" that protrudes into the Sandia Pueblo from the west. Motion at 5. The United States disputes Antonio's two contentions that "the privately held land encompassing the collision site extends westward to the Rio Grande River" and that "the privately held land thereby abuts other non-Indian land, forming a 'peninsula' of private property extending in the boundaries of the Sandia Pueblo . . . ." Response at 2-3. The Court understands the parties' arguments to sound in 18 U.S.C. § 1151(a), as the Supreme Court interpreted that statutory subsection in Seymour. See Seymour, 368 U.S. at 357. See also United States v. Webb, 219 F.3d 1127, 1131 (9th Cir. 2000)( "[I]f the property is within boundaries of the reservation, it is Indian country irrespective of whether it is now held by a non-Indian.")(citing 18 U.S.C. § 1151(a)). The Indian Pueblo Land Act Amendments of 2005, 25 U.S.C. § 331 Note, however, focuses the Court's attention on whether the collision site is located within "the exterior boundaries of any grant from a prior sovereign" -- in this case, the exterior boundaries of the 1748 grant -- not the Sandia Pueblo's present-day exterior boundaries as defined by the aggregate of its contiguous, communal fee-

simple holdings.. 25 U.S.C. § 331 Note.  The Court further notes that, even before the enactment of the Indian Pueblo Land Act Amendments of 2005, 25 U.S.C. § 331 Note, the analysis of "Indian country" with respect to the Pueblos was determined by reference to 18 U.S.C. § 1151(b), not § 1151(a), because the Pueblo's lands are not reservations subject to § 1151(a) analysis.  See, e.g., HRI III, 608 F.3d at 1155; Arrieta, 436 F.3d at 1249-51.  In light of 25 U.S.C. § 331 Note, therefore, whether the collision site lies within private land that currently forms a peninsula protruding into the Sandia Pueblo from the west is an issue that, at best, is ancillary to the Court's jurisdiction.  Nonetheless, the parties argued the peninsular issue, and, out of respect for the parties, the Court decides it.

The Court concludes that the collision site lies within the current exterior boundaries of the Sandia Pueblo; in other words, the collision site is not located within a peninsula of private land jutting into the Sandia Pueblo from the west.  It is undisputed that the Sandia Pueblo does not own the land on which the collision occurred, because that land came into Pedro C. Garcia's private ownership, "under the provisions of the Act of Congress on June 7, 1924 (43 Stat. 636)," confirmed by patents from the United States to Pedro C. Garcia.  See 1933 Garcia Patent; 1934 Garcia Patent.  In 1930, Garcia conveyed in fee-simple a parcel of land to the MRGCD.  See 1930 Garcia Conveyance at 1; April 11 Tr. at 24:4-6 (Stretch).  The 1930 Garcia Conveyance describes the Rio Grande as the west boundary of the tract that Garcia conveyed to the MRGCD. See 1930 Garcia Conveyance at 1.  See also April 11 Tr. at 29:1-2 (Stretch)("The west boundary of the tract is described as the bank of the Rio Grande.").  Since 1914, the Rio Grande has moved west, leaving a strip of land between the Rio Grande's east bank and the original Garcia Parcel, Private Claim 364, which includes that tract that Garcia conveyed to the MRGCD.  See 2004 BLM Survey at 12, 16, 43-44 (noting that in 1914, the western boundary of the Pedro Garcia

Claim, Private Claim 364, was the left bank of the Rio Grande). See also April 11 Tr. at 49:19-25 (Murphy, Ortiz)("Q. Let me ask you is there a portion of Sandia Pueblo land lying between the western boundary of the Pedro Garcia tract and the western boundary of the Sandia Pueblo? A. Yes, it is. All of this portion in here belongs to the Pueblo of Sandia."). The Pueblo of Sandia fenced and posted the land west of the Albuquerque Riverside drain and east of the Rio Grande. See April 11 Tr. at 53:2-8 (Murphy, Ortiz). The Court concludes, therefore, by a preponderance of the evidence that the Sandia Pueblo owns the land located between the current easterly bank of the Rio Grande and the original Pedro Garcia parcel, Private Claim 364, which includes that land which Garcia conveyed to the MRGCD. See April 11 Tr. at 49:19-25 (Murphy, Ortiz); April 11 Tr. at 52:9-10 (Ortiz)(averring that west of the Pedro Garcia parcel, "the rest of the Pueblo of Sandia land").[11] Accordingly, the Court concludes by a preponderance of the evidence that the collision site is located within the Sandia Pueblo's exterior boundaries. The Court also notes that, even if the collision occurred on a peninsula of private land jutting into the Sandia Pueblo from the west, the Indian Pueblo Land Act Amendments of 2005, 25 U.S.C. § 331 Note, nevertheless confer jurisdiction on the Court because the collision occurred within the exterior boundaries of the 1748 grant, which Congress confirmed.

---

[11]Even if 18 U.S.C. § 1151(a) controlled this Court's jurisdiction -- which it does not -- and even if the collision occurred on a peninsula of private land jutting into the Sandia Pueblo from the west -- as Antonio argues -- the United States argues that § 1151(a), in light of Seymour, 368 U.S. at 356-57, confers jurisdiction on the Court. See April 11 Tr. at 70:23-71:15 (Murphy). Again, the Court emphasizes that this argument is premised on incorrect assumptions: (i) 18 U.S.C. § 1151(a) does not control the Court's jurisdiction in this case, see 25 U.S.C. § 333 Note; HRI III, 608 F.3d at 1155; Arrieta, 436 F.3d at 1249-51; and (ii) the collision did not occur on a peninsula of private land jutting into the Sandia Pueblo from the west. Even when entertaining those incorrect assumptions, however, the Court agrees with the United States' position that, in light of Seymour's rationale, 368 U.S. at 356-57, the Court has jurisdiction. Seymour suggests that a checkerboard jurisdiction within Indian country is both impractical and in tension with 18 U.S.C. § 1151(a)'s language and purpose. See Seymour, 368 U.S. at 356-57.

## IV.  **THE INDICTMENT IS SUFFICIENT**.

Last, the Court turns to Antonio's argument that the Indictment is insufficient, because "[i]t is unclear from the indictment which of the three theories [of establishing 'Indian country' under 18 U.S.C. § 1151] the Government intends to use to establish jurisdiction."  Motion at 4. This argument does not persuade the Court.  The Indictment's allegation that, "[o]n or about July 31, 2015, in Indian Country, in Bernalillo County, in the District of New Mexico, the defendant, Jeffery Antonio, an Indian, unlawfully killed Jane Doe with malice aforethought," Indictment at 1, is sufficient to put Antonio on notice "of the essential facts constituting the offense charged," Fed. R. Crim. P. 7(c)(1).  It is also sufficient to put Antonio on notice that the United States intends to invoke the Court's jurisdiction over violations of 18 U.S.C. § 1153 occurring on Pueblo land.

"'An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense.'"  United States v. Todd, 446 F.3d at 1067 (quoting United States v. Dashney, 117 F.3d at 1205).  Further, an indictment "need not quote the statutory language to be legally sufficient."  United States v. Bullock, 914 F.2d at 1414 (citing Hamling v. United States, 418 U.S. 87 (1974)).  The Tenth Circuit also has made clear that when "[i]nterpreting an indictment, [courts] are governed by practical rather than technical considerations."  United States v. Phillips, 869 F.2d at 1364 (alterations added)(citing United States v. Martin, 783 F.2d at 1452 ("Charging documents are tested by whether they apprise the defendant of what evidence he must be prepared to meet. . . .  An indictment should be read in its entirety, construed according to common sense and interpreted to include facts which are necessarily implied."); United States v. Maggitt, 784 F.2d at 598 ("An indictment is to be read in

light of its purpose, which is to inform the accused of the charges.")).

In this case, the grand jury charged that, "[o]n or about July 31, 2015, in Indian Country, in Bernalillo County, in the District of New Mexico, the defendant, Jeffery Antonio, an Indian, unlawfully killed Jane Doe with malice aforethought." Indictment at 1. Antonio does not contest that the Indictment is sufficient to apprise him of "the elements of the offense charged." United States v. Todd, 446 F.3d at 1067 (internal quotation marks and citations omitted). Rather, Antonio's challenge is that the Indictment is insufficient to apprise him of which precise jurisdictional basis the United States intends to invoke in arguing that the Court has jurisdiction over this criminal matter. See Motion at 4.

The Court is skeptical of Antonio's argument. The Sixth Amendment to the Constitution of the United States of America provides that, "in all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. "This constitutional protection is implemented by the requirement of Rule 7(c)(1) that the indictment or information 'be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" Charles A. Wright and Andrew D. Leipold, Federal Practice and Procedure: Criminal 4th § 125, at 542 (2008)(quoting Fed. R. Crim. P. 7(c)(1)). The precise statutory basis of the Court's criminal jurisdiction is not an "essential fact[] constituting the offense charged," Fed. R. Crim. P. 7(c)(1), and its omission from the indictment does not deprive Antonio of the "fair notice of the charges against which he must defend," United States v. Todd, 446 F.3d at 1067. Cf. United States v. Bullock, 914 F.2d at 1414 (concluding that failure to quote the precise statutory language does not render an indictment deficient if the indictment otherwise gives a defendant sufficient notice of the criminal charge).

The Indictment makes evident that the United States intends to establish that the Court

has jurisdiction, because Antonio is "an Indian" and his offense occurred "in Indian Country." Indictment at 1. The Indictment's allegation that the unlawful killing occurred "in Indian Country in Bernalillo County, in the District of New Mexico" is sufficient to put Antonio on notice that the United States intends to invoke the Court's jurisdiction over criminal offenses occurring within the Sandia Pueblo's exterior boundaries. See United States v. Phillips, 869 F.2d at, 1364 (citing United States v. Martin, 783 F.2d at 1452 ("An indictment should be read in its entirety, construed according to common sense and interpreted to include facts which are necessarily implied."). Moreover, Antonio's argument that the Indictment is insufficient to put him on notice of the United States' jurisdictional argument is belied by Antonio's thorough argument that the collision did not occur within the Sandia Pueblo's exterior boundaries. See Motion at 3-6. Cf. United States v. Floyd, No. 14-CR-0043-CVE, 2014 WL 1765008, at *2 (N.D. Okla. May 2, 2014)(Eagan, J.)("The Court finds that the indictment adequately alleges that the offense occurred within the special aircraft jurisdiction of the United States and defendant has sufficient notice of the charge against him.").

Considering the Indictment's reference to "Indian Country," in addition to the United States' not invoking the Indian Pueblo Land Act Amendments of 2005, 25 U.S.C. § 331 Note, either in their papers or at the hearing, the Court is not convinced that the Indictment makes clear that the Court has jurisdiction over alleged violations of 18 U.S.C. § 1153 within the exterior boundaries of the Sandia Pueblo's 1748 land grant. See 25 U.S.C. § 331 Note. Again, that precise articulation of jurisdictional theory is not the Indictment's purpose; its purpose is to inform Antonio of the charge against him. See United States v. Phillips, 869 F.2d at 1364 (citing United States v. Maggitt, 784 F.2d at 598)("An indictment is to be read in light of its purpose, which is to inform the accused of the charges."). Even if the Indictment did not make clear that

the Indian Pueblo Land Act Amendments of 2005, 25 U.S.C. § 331 Note, provides jurisdiction, Antonio is not alone in guarding against any erroneous invocation of the Court's jurisdiction. The Court has a duty to determine the grounds of its jurisdiction, even where the parties do not raise the issue.  See United States v. Torres, 372 F.3d 1159, 1161 (10th Cir. 2004)("'[I]t is the duty of the federal court to determine the matter [of jurisdiction] *sua sponte.*'")(alteration added)(quoting Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974)). Accordingly, the Court concludes that the Indictment is sufficient under the requirements of the Sixth Amendment and of rule 7(c)(1) of the Federal Rules of Criminal Procedure.

**IT IS ORDERED** that: the Defendant's Motion to Dismiss for Lack of Federal Subject Matter Jurisdiction, filed April 10, 2017 (Doc. 62), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

James D. Tierney
  Acting United States Attorney
Joseph M. Spindle
Michael D. Murphy
  Assistant United States Attorneys
United States Attorney's Office

    *Attorneys for the Plaintiff*

Marc H. Robert
Irma Rivas
  Assistant Federal Public Defenders
Office of the Federal Public Defender

    *Attorneys for the Defendant*